Argued February 2; affirmed March 13, 1934

## LAMMERS *v.* HINSDALE

(30 P. (2d) 335)

*John C. Veatch,* of Portland (Joseph, Haney & Veatch, and James P. Powers, all of Portland, on the brief), for appellant.

*Harry G. Hoy,* of Portland (Hoy & Doxey and Arthur E. Prag, all of Portland, on the brief), for respondent.

BAILEY, J.  This action was instituted by plaintiff on his own and two assigned claims for salaries due plaintiff and two of his associates for services alleged to have been rendered to Charles Snell, M. B. Griffin and the defendant, G. Spencer Hinsdale, and agreed to be paid for by the defendant. From a judgment in favor of the plaintiff and against the defendant on these three claims, the defendant prosecutes this appeal.

██ In the first cause of action it is alleged that on or about June 26, 1931, Charles Snell, M. B. Griffin and the defendant associated themselves together for the purpose of forming a corporation with the object of manufacturing, selling and distributing Worthmore auto polish; that the defendant authorized and instructed Griffin to employ the necessary staff of workers and salesmen for manufacturing and marketing the polish, and further authorized Griffin to purchase necessary supplies to be used in such manufacture; and that the defendant agreed to pay the wages of any and all men so employed by Griffin, for whatsoever services they might perform pursuant to such employment. The complaint further states that Griffin employed the plaintiff for and on account of the defendant to assist in the manufacture, promotion and sale of the said product at an agreed compensation of $50 per week; that the plaintiff performed his duties as such employee between June 26, 1931, and July 27 of the same year; and that on or about July 6, 1931, the defendant ratified and confirmed the authority of Griffin to employ the plaintiff for and on behalf of the defendant, and promised and agreed to pay plaintiff's salary.

The second and third causes of action are similar to the first, except that they refer to the employment of B. D. Curtis and A. W. Roland at salaries of $40 and $25 per week, respectively. Their claims were assigned to the plaintiff for the purpose of bringing action thereon.

The defendant in his answer denies the material allegations contained in the complaint.

The two assignments of error urged by defendant on this appeal are based on the refusal of the trial court to grant his motions for an involuntary nonsuit and for a directed verdict in his favor. The reason

advanced in support of these motions is that the record does not contain any evidence showing that Griffin had any authority to employ plaintiff or either of his assignors on behalf of the defendant, or that said employment was ratified by the defendant.

In passing upon the questions raised by defendant's assignments of error, we need consider only whether or not there is sufficient evidence in the record to warrant the trial court's submitting the case to the jury. We shall therefore briefly review the evidence in the case.

On or about June 21, 1931, Mr. Griffin first met the defendant at the residence of Mr. Snell, a brother-in-law of the defendant, where Griffin, Lammers and Roland had gone to demonstrate the Worthmore polish on Mr. Snell's automobile. At that time Mr. Griffin was vice-president of a corporation known as Worthmore Products Co., having its principal place of business at Shenandoah, Iowa, and engaged in the manufacture of Worthmore polish. Some discussion was had at that time about the establishment of a branch factory by this corporation in California. Griffin ascertained that the defendant was employed in the American National Bank, and on the following day, Monday, called in the morning on the defendant at his place of business and at that time discussed with him the question of locating a branch factory in Portland.

According to Griffin's testimony, Mr. Hinsdale agreed to furnish a minimum of $30,000 capital to start a plant in Portland, and to supply a board of directors, if Griffin "could purchase the Worthmore Products Co. for the sum of $10,000 or could supply the formula of this auto cleaner and thereafter act as general manager of a company to be formed for the purpose of manufacture and sale of this product". Several other conferences were had by Mr. Griffin

with the defendant, and on or about June 26 Mr. Griffin went East to see about the purchase of the Worthmore formula. Before going, however, he had borrowed from the American National Bank $768.85 and had pledged as collateral certain accounts receivable from the sale of the polish, also a supply of the polish which was in a warehouse.

On his trip and while in Iowa, Griffin sent several telegrams to Hinsdale and on July 3 Hinsdale telegraphed him as follows: "Lammers in my office now. Stop. We can not understand what your wires are all about. Please settle down and talk sense. Offer your man $1,000 for the formula and come back to Portland. Regards."

Shortly after receiving this telegram Mr. Griffin returned to Portland. On July 6, accompanied by Mr. Lammers and Mr. Curtis, he called upon Mr. Hinsdale. In regard to that visit the plaintiff testified as follows: "On that day we went to see Mr. Hinsdale. The first thing Mr. Griffin showed him was a formula that he had brought back from Omaha. He said: 'This is my crew, with the exception of one man, Mr. Roland, who is busy at this time.' They discussed the formula at some length and some other conversation there that I don't remember and Mr. Griffin finally asked Mr. Hinsdale: 'These gentlemen want to know who is going to pay them.' Mr. Hinsdale said: 'I will take care of the salaries and pre-organization expense.' There was some other conversation there that I don't remember."

Mr. Griffin stated, on direct interrogatories propounded to him, that there was a definite understanding between himself and the defendant as to the furnishing of an organization for the manufacture and sale of automobile polish, and a further understanding between them that the plaintiff and his two assignors were to be employed at the weekly salaries stated in

the complaint. In answer to the question as to whether or not there was an understanding between them concerning who should pay those salaries, Mr. Griffin stated: "Mr. Hinsdale was to furnish funds to pay salaries and pre-organization expense. I asked him point-blank as to this arrangement in the presence of Mr. Curtis and Mr. Lammers at Mr. Hinsdale's office, and Mr. Hinsdale agreed to take care of it." On cross-interrogatories the following testimony was given by Mr. Griffin:

"Q. State whether or not the defendant, Mr. Hinsdale, knew the amount of money being paid said parties and whether or not he had any personal knowledge of their services in connection with said company.

"A. Yes. A daily report was rendered to Mr. Hinsdale and each person employed was personally discussed with him and his approval obtained."

In answer to a further question as to when and in whose presence Mr. Hinsdale agreed to pay the salaries, Mr. Griffin stated: "At the conference in Mr. Hinsdale's office on July 6, 1931, Mr. Hinsdale ratified our former conversations from June 22, 1931, to July 6, 1931, inclusive, and in particular my agreements with Mr. Lammers, Mr. Curtis and Mr. Roland, in the presence of Mr. Lammers, Mr. Curtis and myself by directly stating that all pre-organization expense and salaries would be paid by him, Mr. G. Spencer Hinsdale."

The defendant, as a witness on his own behalf, testified on direct examination as follows:

"Q. State whether or not he [Griffin] left reports there as to what his various men were doing, how much they were getting, so on and so forth.

"A. I think he did, on various occasions, leave information of that sort, all sorts of information, anything to attract my attention."

There is evidence in the record to the effect that the plaintiff and his assignors were making preliminary investigations relative to the manufacture of an automobile polish and that the defendant was kept informed as to what they were doing. In this connection Mr. Hinsdale is said to have advised these men to get prices on cans, to find out where ingredients for the polish could be obtained, and to ascertain what the labels would cost. He also offered to let them use an old building where experiments could be conducted.

The case was tried on the theory that Griffin had employed the plaintiff and his assignors to perform services incidental to the organization of a corporation contemplated by Griffin, Snell and the defendant, with the understanding that the defendant was to pay the pre-organization expenses, and that on or about July 6 the defendant had ratified the acts of Griffin in making such employment. The defendant, on the other hand, maintains that in order to prove a ratification of Griffin's acts it was necessary to show that the defendant was advised in detail of all the facts connected with the employment, at the time of the alleged ratification, but that the evidence fails to disclose that the defendant was so advised.

In speaking of the act of ratification, Mechem on Agency (2d Ed.), § 432, states:

"Ratification being a matter of assent to and approval of the act as done on account of the person ratifying, any words or acts which show such assent and approval are ordinarily sufficient. Thus clearly, where the principal, when informed of the act, agrees to it, or says that he is glad it is done, or says that it is 'all right,' and directs that the matter be proceeded with, or declares that he will assume the unauthorized contract, or agrees to pay the price stipulated for, or promises to perform on his part, or directs that the transaction be completed, and the like; there is evidence of ratification."

From Restatement of the Law of Agency, volume 1, we quote as follows:

"Where the purported principal is shown to have knowledge of facts which would lead a person of ordinary prudence to investigate further, and he fails to make such investigation, his affirmance without qualification is evidence that he is willing to ratify upon the knowledge which he has. Likewise, if, learning that one who had no authority acted for him, he affirms without qualification and without investigation, when he has reason to believe that he does not know all the facts, it may be inferred that he is willing to assume the risks of facts of which he has no knowledge.

"The unqualified affirmance of acts of service, during the course of which the purported principal has reason to believe that there may have been a variety of unknown incidents, raises the inference that he is willing to take the risk of the completeness and accuracy of such knowledge as he has, except as to events not likely to happen. Whether or not an event is so extraordinary that it is inferred that he did not intend to risk its occurrence is a question to be decided by the triers of fact. [p. 224, § 91-e]

"Silence under such circumstances that, according to the ordinary experience and habits of men, one would naturally be expected to speak if he did not consent, is evidence from which assent may be inferred. Such inference may be drawn although the purported principal had no knowledge that the third person would rely upon the supposed authority of the agent; his knowledge of such fact, however, coupled with his silence, would ordinarily justify an inference of assent by him. Whether or not such an inference is to be drawn is a question for the jury, unless the case is so clear that reasonable men could come to but one conclusion." [p. 234, § 94-a]

In the case at bar the claim of plaintiff and that of one of his assignors were for approximately one month's salary beginning June 26, 1931, whereas the claim of the other assignor was for services dating

from July 1 to August 10, 1931. It will therefore be seen that most of the work performed by these employes was done after the meeting with Mr. Hinsdale on July 6, at which time the latter is alleged to have stated that he would pay the pre-organization expenses and salaries of those therewith connected. In other words, the contract of employment was not, at the time of the ratification of employment, fully executed. Except as to a few days of employment, the contract, at the time of its alleged ratification by defendant, was in its nature executory; and, if the testimony of plaintiff and his witnesses is to be given full credence, Mr. Hinsdale was personally interested in the services which had already been, and which were to be, performed by these employees. According to the defendant's own testimony, he was furnished frequent reports as to what these men were doing and the salaries which were being paid to them.

In passing upon the defendant's motions, the testimony must be considered in its light most favorable to the plaintiff, and, unless this court can say that there is no competent evidence in the case from which the jury could find in favor of the plaintiff, the motions must be decided adversely to the defendant. We find from examination of the entire record that there is evidence from which the jury might find or might properly infer that the defendant did ratify the employment of plaintiff and his assignors and did agree to pay for their services. As we hold this view of the case, the judgment appealed from must be affirmed, and it is so ordered.

RAND, C. J., BEAN and CAMPBELL, JJ., concur.