14527

BOURNE, PROBATE JUDGE, *ET AL.*, v. MARYLAND CAS-
UALTY COMPANY *ET AL.*

(192 S. E., 605)

2

4

*Messrs. Wright & Burroughs,* for appellant Maryland Casualty Company, cite:

*Mr. G. Lloyd Ford,* for appellant, Bernice H. Frierson, cites:

*Mr. C. B. Thomas,* for respondents, cites:

*Messrs. W. B. Suggs* and *F. A. Thompson,* for respondent, Peoples National Bank, cite:

August 30th, 1937.

The opinion of the Court was delivered by Mr. Chief Justice Stabler.

The following facts appear: The estate of Willie McRay, a soldier who died during the World War, was administered upon by one Benjamin T. Frierson, who, as a prerequisite to his appointment, on September 15, 1933, executed an administration bond with the Maryland Casualty Company, as surety, in the sum of $10,000.00. On October 4, 1934, before the estate had been fully administered, Frierson died, and W. M. Goldfinch, one of the plaintiffs herein, was appointed to succeed him as administrator *de bonis non*. Bernice H. Frierson, the widow of Benjamin T. Frierson, became administratrix of his estate.

This action was commenced on May 28, 1935. The plaintiffs alleged that Frierson, prior to October 31, 1933, received in his official capacity $5,000.00 from the United States government on account of war risk insurance carried by it on the life of McRay, and deposited same to his credit, as such administrator, in Peoples National Bank of Con-

way, S. C.; that he thereafter procured orders from the Probate Judge directing payments to Sana M. Montgomery and Arthur McRay, sole distributees of the estate of Willie McRay, distributive shares totaling $4,000.00, and issued checks against the deposit in their favor in accordance with such orders; "that he forged, or caused to be forged, their names and endorsements to these checks, caused them to be paid by the said Peoples National Bank and charged against the estate deposit;" and that he appropriated the entire $4,000.00 to his own use, "and neither delivered the said checks, nor any part of the proceeds thereof, to the distributees of the said estate." It was further alleged that the administrator, by false representations, obtained from the Probate Judge an order directing payment of $250.00 "as a fee for his attorney, which said amount was paid to him for that purpose and charged against the estate deposit," but that, on information and belief, he appropriated the entire sum to his personal use, "and that the same constitutes no lawful charge against the assets of the estate." Also, that the administrator wrongfully obtained orders from the Probate Judge directing payment to himself, as commissions, sums totaling $228.76; "that he issued checks therefor, cashed the same, and appropriated the proceeds thereof to his own use, having had the same charged against the estate deposit; and that the said administrator was entitled to no part thereof for the reason that such payments included commissions on unlawful disbursements, and for the further reason that the said administrator failed to file any accounting as he is by law required to do." Judgment was asked for in the sum of $4,778.76.

Bernice H. Frierson, as administratrix, demurred to the complaint as not stating facts sufficient to constitute a cause of action, in that it appeared from its allegations that the suit was one for the recovery of a debt, and as such could not be maintained against her in her official capacity, as was here attempted to be done, "within a less period than one

year of this defendant's intestate's death." The matter was heard by his Honor, Judge Gaston, who overruled the demurrer on the ground that the action was "not strictly a suit on a debt," but was one "on a bond which is required by law, which I think should be distinguished from a debt." By leave of the Court, the defendant then filed an answer to the complaint, alleging that her intestate, if he were appointed as administrator of the estate of Willie McRay, "duly and regularly accounted for all funds coming into his hands and made payment thereof in accordance with law." She also set up as a defense the ground urged as the basis of her demurrer, and asked that the complaint be dismissed as to her.

On motion of Maryland Casualty Company, his Honor, Judge Dennis, ordered the Peoples National Bank be made a party defendant. The casualty company then served its answer and cross-complaint on the plaintiffs and the bank. Its first defense was a general denial; its second, a counterclaim against the plaintiffs in the sum of $38.40 for a premium alleged to be due it on the administrator's bond. By way of a cross-complaint, and for a cause of action against its codefendant, Peoples National Bank, it alleged that, as a consideration for becoming surety on Frierson's bond, it was agreed between the company and Frierson that all funds coming into his hands, as administrator of the estate of Willie McRay, should be deposited in the Peoples National Bank of Conway, subject to the joint control of the company and of the administrator; that L. D. Magrath was appointed as the company's attorney in fact "for the purpose of exercising control on behalf of this defendant over the estate funds so deposited," one of his duties being to countersign all checks drawn on such funds by the administrator; that on October 24, 1933, the sum of $5,000.00 was deposited in the defendant bank to the account of B. T. Frierson, as administrator of the estate of Willie McRay; that Frierson thereafter drew several checks on this account in

favor of various payees, which were countersigned by Magrath as attorney in fact, and which were paid by the bank; that the names of the payees were forged or fraudulently indorsed on the back of these checks by some unknown person or persons, and that, by reason of the acts of the defendant bank in paying over the funds on these forged indorsements, "in violation of its duty arising out of the contract of deposit between the parties," the defendant company had been damaged in the sum of $4,300.00, the total amount so withdrawn, and for which it asked judgment in its favor against the defendant bank. It also demanded judgment against the plaintiffs for the sum of $38.40, the sum alleged to be due it as an unpaid premium on the administration bond.

The Peoples National Bank interposed a demurrer to the cross-complaint, which was overruled. It then filed an answer, setting up a number of defenses. It denied, among other things, that its codefendant had been hurt by any acts on the part of the bank, and alleged that the damage done the company was due to that defendant's own negligent and careless conduct, in the several particulars set out in the answer.

The case was tried in October, 1936. At the conclusion of the testimony for the plaintiffs, the defendant casualty company made, in effect, a motion for a nonsuit on grounds hereinafter referred to. The motion was refused; and that defendant then offered testimony on its own behalf at the close of which counsel for the bank moved for a nonsuit on the ground that the checks in question were made to fictitious payees, and that the bank, under applicable law, was not liable in its payment of such checks. This motion was granted by the trial Judge, who stated that he did not think that the bank, under the evidence, could be held to have been negligent in any way.

The plaintiffs, upon the completion of testimony on behalf of the defendant, Bernice H. Frierson, as administratrix,

made a motion for a directed verdict. At the same time, similar motions were made by the defendants, the administratrix, and the surety company. Those of the defendants were overruled, and a verdict was directed for the plaintiffs for $4,894.80.

The appeal of the Maryland Casualty Company, which we will now consider, presents several questions for decision. It is contended, in the first place, that the trial Judge committed error in refusing to grant the motion of this defendant "that as to it that part of the allegations and proof which relates to the cashing by the bank of certain checks upon their forged endorsements be withdrawn from the consideration of the jury upon the grounds that:

"(1) The bond provides that B. T. Frierson, administrator of the goods, chattels, and credits of Willie McRay, deceased, shall make inventory, administer the estate as required by law, etc.—all acts done in his official capacity—whereas the proof, considered most strongly from the viewpoint of the plaintiff, is that the acts which brought loss to the estate were the forging of certain endorsements and the representation to the bank that the endorsements were genuine, acts which are purely individual and personal.

"(2) Upon the deposit of funds in the bank, title thereto vested in the bank and a debtor and creditor relation was established between the estate and the bank, so that such appropriation of funds as may have occurred was not an appropriation of funds of the estate but of the bank. Not having been disbursed to proper payees, insofar as the estate is concerned, the bank is still indebted to the estate."

Judge Dennis in refusing the motion said: "Plaintiff in this case is the estate, and a man who issues a check in his official capacity as administrator, as a part of a scheme to take the estate money, it makes no difference to the estate whether he cashes it himself or has nothing to do with cashing it, if it is fraud on the estate, misappropriation of the money, I couldn't direct a nonsuit as to the estate. The

estate is entitled either out of the surety company or the bank to its money, if it was misappropriated, and to turn the surety company loose because Frierson may have acted in his individual capacity in getting the money out of the bank, he certainly had to act in his official capacity before he could get it, because he had to sign the check as administrator and that check was countersigned and when that was presented to the bank it was no longer the bank's money."

Briefly stated, the undisputed evidence shows that Frierson, at the time he deposited to his credit, as administrator of the estate of Willie McRay, the $5,000.00 in the Peoples National Bank of Conway, advised the bank that L. D. Magrath, as attorney in fact, would countersign all checks in order to make them payable; that he thereafter secured orders from the Probate Court authorizing the issuance of checks to the purported beneficiaries of the estate; that he signed them as administrator and secured the countersignature of Magrath, as was required; that he forged, or caused to be forged, the indorsements of the payees, and also wrote his own name on the back thereof apparently as an indorser; that he then presented these checks to the bank on which they were drawn, and in which he had deposited, as administrator, the funds of the estate, and, upon his representations that they had been properly indorsed by the payees thereof, the bank cashed them; but that Frierson never turned over to the beneficiaries any part of these estate funds.

Counsel for the appellant state that "for the purposes of the motion and for the purposes of this discussion, Frierson's guilt will be conceded"; that is to say, his guilt of forgery and of the charge of falsely representing to the bank that the indorsements were genuine. They contend, however, that the loss sustained by the estate—and this is the primary point, as is seen, raised by the grounds of the motion— was due to the individual acts of Frierson, the administrator, for which the surety on his bond cannot be held liable.

They concede that, "in securing the orders of the Probate Court authorizing the issue of checks to the beneficiaries, in signing the checks as administrator and in securing the countersignature of L. D. Magrath, as attorney in fact, Frierson's action was official," but argue that none of these acts produced loss to the estate. They say that the proximate cause of the loss "consisted in the forging of the endorsements and in falsely representing to the bank that the endorsements were genuine," acts of Frierson as an individual and not in his official capacity.

We think that the trial Judge, under the evidence and applicable law, properly refused the appellant's motion. The character of the liability of the sureties on the bond of an administrator and how such liability can be ascertained is well settled by our decisions. *Wiley v. Johnsey*, 6 Rich, 355; *Jennings v. Parr*, 62 S. C., 306, 40 S. E., 683. As appears from the record, the administrator not only defaulted in respect to the duties which he had assumed to discharge, but we have here a case in which he devised a systematic plan, which was rooted in his official acts, to defraud the estate. In other words, Frierson's acts as administrator, the securing of the orders from the Probate Court, signing the checks, and obtaining the countersignature of the attorney in fact, were an essential part of his scheme, and without which the fraud, with the resultant loss to the estate, could not have been perpetrated as was done. The contention, therefore, that certain intervening acts of the administrator, referred to as his individual acts, alone produced the loss complained of, is held to be without merit.

The same question was raised in *Stewart v. Commonwealth*, 104 Ky., 489, 47 S. W., 332, 333. That was a case in which a deputy clerk of the Court issued fraudulent witness certificates, forged the indorsements of the persons named as payees, and sold the certificates to a third party. The sureties on the bond of the clerk of the Court paid the loss sustained by the action of the deputy, and then sought

to be subrogated to the rights of the commonwealth against a person to whom payments on the certificates were made. It was contended that the acts of the deputy in issuing the certificates were official in character, but that his acts in forging the indorsements as he did and selling the certificates to a third party were his individual acts, and for that reason the sureties were not liable on the bond which they signed. The Court, however, holding against this view, said: "We cannot understand why the fact that Moore added forgery to his offense of issuing as deputy clerk the fraudulent certificates would release the sureties from liability. It was part of Moore's fraudulent design to both issue and indorse the certificates which culminated in producing the loss which is the subject of this controversy. It was unfaithfulness to his trust that caused the injury. In this transaction the acts of Moore cannot be disassociated so as to designate some as official and others as individual."

Nor do we agree with appellant's contention as made by the second ground of the motion, to wit, "that such appropriation of funds as may have occurred was not an appropriation of funds of the estate but of the bank." It is true, as stated, that when the deposit was made by Frierson, as administrator, a creditor and debtor relation was established between the bank and the estate, and that title to the funds vested in the bank. The estate had, however, by reason of such deposit, a credit equal to the amount thereof, and repayment could be demanded at any time. So, when the bank cashed the checks drawn against the deposit by Frierson, as administrator, and presented by him for payment, in the manner and under the circumstances above detailed, it was undoubtedly divested of title to the funds so paid out. The appropriation by Frierson of such funds, therefore, was not, as contended, an appropriation of the assets of the bank. But counsel argue further that, if such funds were not assets of the bank, they were "assets of the proper payees of the checks." This point was not raised

by the grounds of the motion, but the Court has no doubt as to the proper disposition of it. There was no delivery or intended delivery of the checks or the proceeds thereof to the persons named as payees. In fact, such persons were totally ignorant of the acts of the administrator in the matter. And it seems too clear for argument that the mere writing of the checks, as was done, could possibly have vested title in the named payees. The funds in question, therefore, were assets of the estate, and the Court was correct in so holding.

The next contention of the appellant is that the trial ■ Judge committed error in granting the bank's motion for a nonsuit. As we have already stated, the ground of the motion was that the checks in question were made to fictitious payees, and that the bank, under applicable law, was not liable in the payment of such checks. The Court, while of that view, appears to have rested its decision mainly upon the ground that the bank, under the evidence, could not be held to have been negligent in any way. We quote: "The evidence brought out in this case by the plaintiff is undisputed that Sana Montgomery never got any of this money, nor did any other person interested in the estate as distributees get any money out of the estate. The checks are issued and signed by B. T. Frierson, as administrator of the estate of Willie McCravy, and are countersigned by L. D. Magrath, attorney-in-fact, he being the representative of the indemnity company, and it being required that he should countersign all of the checks. * * * There is not a scintilla of evidence to show that any of the distributees ever got a penny. The testimony of the plaintiff, through Mr. Spivey, president of the bank, showed that these checks were presented at the bank by Mr. Frierson with someone purporting to be the payee, and the checks are endorsed by Mr. Frierson. * * * And the evidence shows conclusively to my mind that when the checks were issued he intended that the named payee, whether real or

fictitious, should not receive the money; in fact, none of them did, and while Mr. Frierson, as an individual received the money, yet in his official capacity he issued these checks as a part of that scheme. It seems to me when a check properly signed and countersigned, in this case properly endorsed and witnessed by the person who signed the check, whether he signed it in some trust capacity or as an individual, would be all that the bank would be required to investigate. When the maker of a check in person identifies the payee and induces the bank to pay out the money, I don't think the bank could be held to be negligent in any way."

Section 6760 of the Code of 1932, which is a part of the Negotiable Instruments Law, provides that an instrument is payable to bearer: "(3) When it is payable to the order of a fictitious or nonexisting person, and such fact was known to the person making it so payable." But the appellant and the respondent bank are not in entire agreement as to the signification of the words "fictitious or non-existing person," as used in the statute. Counsel for the appellant say that, where the drawer of a check selects the name of a person known to him "but having no interest in the check or rights under it, the person whose name is so selected is a fictitious payee and the check is a bearer check"; but that the situation is entirely different "if the person named as payee was actually entitled to the check, or had an interest in the proceeds thereof or rights therein"; that in such a case the person named is not a fictitious payee, regardless of the intention of the maker of the check. Counsel for the bank argue that the *intent* of the drawer of the check in inserting the name of the payee is the *sole test* whether the payee is a fictitious person; and that the "interest of the payee" is determined by whether or not the maker intended for him to receive the proceeds.

In 5 R. C. L., 497, we find the following: "When the legislature declared that a check payable to a 'fictitious or nonexisting person' is to be regarded as payable to bearer,

it meant a fictitious person to be one who, though named as payee in a check, has no right to it, or the proceeds of it, *because the drawer of it so intended,* and it, therefore, matters not whether the name of the payee used by him be that of one living or dead, or of one who never existed. The maker's intention is the controlling consideration which determines the character of such paper." (Italics added.) See *Snyder v. Corn Exch. Nat. Bank,* 221 Pa., 599, 70 A., 876, 128 Am. St. Rep., 780; *Phillips v. Mercantile National Bank of N. Y.,* 140 N. Y., 556, 35 N. E., 982, 23 L. R. A., 584, 37 Am. St. Rep., 596; *Mueller & Martin v. Liberty Insurance Bank,* 187 Ky., 44, 218 S. W., 465; *Shipman v. New York Bank,* 126 N. Y., 318, 27 N. E., 371, 12 L. R. A., 791, 22 Am. St. Rep., 821; *Bartlett v. First National Bank,* 247 Ill., 490, 93 N. E., 337; *Harmon v. Old Detroit Nat. Bank,* 153 Mich., 73, 116 N. W., 617, 17 L. R. A. (N. S.), 514, 126 Am. St. Rep., 467; *Sockland v. Storch,* 123 Ark., 253, 185 S. W., 262, Ann. Cas., 1918-A, 668; 8 C. J., 179.

In 7 Am. Jur., 840, it is said that "there is no question among the decisions that where the payee in a bill or note is a nonexisting person, known to the maker or person sought to be charged as such, and is purposely used with no intention that he shall have any interest in the note or bill, he is a fictitious payee, within the rule that a note or bill payable to a fictitious payee with the knowledge of the maker or drawer is, in favor of an innocent purchaser, to be considered as payable to bearer"; and that, "where the payee actually exists, whether he is to be considered as fictitious depends on the intention of the parties. Thus, it is generally held that where a bill or note is made payable to a person known to exist, but with no intention that he shall ever have any interest in the instrument, the name being used entirely as a matter of form, it is considered to be payable to a fictitious payee and as such payable to bearer. But where the payee is in existence and is the person actually

intended, he cannot be considered as fictitious and the rule as to fictitious payee is not applicable."

The appellant relies upon certain decided cases which seem to give some support to its contention. In one of these, *Norton v. City Bank & Trust Company* (C. C. A.), 294 F., 839, 844, the Court held that "the law is now well settled that a negotiable instrument is drawn to a fictitious payee whenever the payee named in it *has no right to it,* and its maker does not intend that such payee shall take anything by it." (Italics added.) It is contended that the italicized portion of the above quotation indicates that the Court, had it been shown that the named payee had any actual right to or under the instrument, would have held that the payee in such case is not a fictitious one. Cited to the same effect are *Atlanta & Lowry National Bank v. First National Bank of Carrollton,* 38 Ga. App., 768, 145 S. E., 521; *First National Bank of Kansas City v. Produce Exchange Bank,* 227 Mo. App., 908, 59 S. W. (2d), 81; *Hackensack Trust Company v. Hudson Trust Company,* 119 Misc., 689, 197 N. Y. S., 158; *American Hominy Company v. National Bank,* 294 Ill., 223, 128 N. E., 391.

We do not think, however, that these cases, although containing some such expression as above quoted, are decisive of the contention made. Almost every decided case examined involved a different state of facts; but in all of them the sole test was as stated, to wit, whether the named payee was a fictitious one depended upon the knowledge and intent of the maker of the instrument. But the appellant argues, as already said, that we have here a fact not appearing in other cases, namely, that the persons named in the checks as payees had some actual interest in the estate, and for that reason, despite Frierson's knowledge and intent as the drawer of such checks, were not fictitious payees. It is true, in order to perpetrate the fraud upon the estate, as was done, Frierson, as administrator, used the names that he did in an apparently legitimate exercise of his au-

thority, still this was merely done, as the evidence shows, as a subterfuge or trick to mislead and deceive the Judge of Probate and others to whose attention the matter might necessarily come. He knew that these named payees were fictitious; that is to say, he fully intended that they should have no right either to the checks themselves or to the proceeds thereof. If, therefore, a fictitious person, as is held, is meant to be one, though named therein as payee, who has no right to the check or to the proceeds of it, *because the drawer of it so intended,* then it is clear, under the facts of this case, that the payees, whether existing or nonexisting persons, whose names were inserted in the checks made by Frierson, as administrator, were fictitious beings.

It is finally urged by counsel that any check issued by Frierson, as administrator, was not a completed instrument under the contract of deposit until it had been countersigned by Magrath, as attorney in fact, and that the "joint action of Frierson and Magrath in signing and countersigning, respectively, was necessary to utter the check as to constitute any authoritative direction to the bank to pay it." In other words, they say, in order to make the checks payable to a fictitious payee, it was necessary that the intent that none of the proceeds of the checks should reach the payees designated therein be the joint intent of Frierson and Magrath. In any event, that the Court should have submitted the question to the jury. We are not in accord with this view. The deposit in the bank was not the joint account of the administrator and the surety, which would have required both to sign the check as drawers before the bank would cash them. The countersigning by Magrath, as attorney in fact, of the checks issued by Frierson, as administrator, was a precautionary measure on the part of the surety for its own protection in seeing that the administrator properly administered the estate in the paying out of the funds. In no sense can it be said that the surety, or its attorney in fact, Magrath, was a drawer of

the checks. Frierson, as administrator, alone was such. His intent, therefore, is determinative of the matter as to whether the named payees were fictitious or not.

We will now consider, notwithstanding the conclusions above reached, the appellant's contention that "the bank assisted the fiduciary to accomplish the misappropriation, having constructive knowledge that fraud was being perpetrated by the fiduciary," and for that reason it is liable for the loss sustained by the estate. This question is between the bank and the appellant, the plaintiffs claiming nothing as against the former.

What constitutes notice or knowledge to a bank of deposit of an intended misappropriation by a fiduciary of trust funds is one that depends upon the particular facts and circumstances of the case. The authorities all agree that, if a bank knowingly assist the fiduciary in the misappropriation of such funds, it is liable for the loss sustained; but as to what constitutes such knowledge is a question in regard to which they are not in full accord. Of course, if the bank had notice or knowledge of the intended misappropriation and aided and abetted the fiduciary in the matter, then it would be answerable. As the question, therefore, at issue must be determined by the facts as they appear from the evidence in the case, we will not review the numerous decisions cited by opposing counsel, not deeming it necessary to do so, but will only state the general governing principles laid down by the authorities.

The following is found in 26 R. C. L., 1316: "The presumption is that a trustee will faithfully administer his trust and not misappropriate funds committed to his care, and so if moneys are deposited by one as trustee, he, as such trustee, has a right to withdraw them, and the bank, in the absence of notice to the contrary, is bound to assume, and is protected in assuming, that the trustee will appropriate the moneys, when drawn, to the proper use; and this is true whether the checks are signed by him in his

representative capacity or not. But if a bank in which moneys are deposited in the name of a trustee as such has knowledge that a breach of his trust is being committed by the improper withdrawal of such funds, or if it participates in the profits or fruits of any fraud on the trust, it is answerable. The mere fact, however, that a bank knows that moneys deposited with it have by a depositor been acquired in a fiduciary capacity does not impose on it the duty, or give it the right, to institute an inquiry into the conduct of its customer in order to protect those for whom he may hold the fund, but between whom and the bank there is no privity."

And in 7 Am. Jur., 375: "It is the well-settled general rule that if a bank has notice or knowledge that a fiduciary is misappropriating or intends to misappropriate trust funds which he seeks to withdraw, the bank incurs liability to make good the amount thus misappropriated, for the reason that the bank makes itself a privy and instrumentality to the commission of the fraud by failing to prevent its accomplishment, and especially is this so if it participates in the misappropriation and receives the fruits of it by obtaining payment of a debt due it by the fiduciary in his individual capacity. What is more, it would seem clear that where a bank has aided the improper withdrawal of trust funds, the surety on the official bond of the trustee, having paid the loss thereby sustained by the *cestui que* trust, may recover of the bank the loss sustained, being subrogated to the rights of *cestui que* trust." See, also, *U. S. Fidelity & G. Co. v. Home Bank for Savings,* 77 W. Va., 665, 88 S. E., 109; *Cocke's Administrator v. Loyall,* 150 Va., 336, 143 S. E., 881.

In *Merchants' & Planters' Nat. Bank v. Clifton Mfg. Co.,* 56 S. C., 320, 33 S. E., 750, 755, the Court said: "Furthermore, it must be remembered that no bank is made to exercise supervisory functions over its depositors. If knowledge comes to the bank that any agent who is allowed to check upon the funds of his principal on deposit with it is about to commit a breach of trust in drawing checks upon

the fund in bank, of course, in such an event, it would be the duty of the bank to protect the rights of the principal; but, to acquire this knowledge, such bank will not be required to exert itself beyond the channels of its business. To hold a bank to a higher duty than that of being bound within the channels of its business in acquiring information of any projected breach of trust by an agent who has the power to check all the funds of the principal from the bank, would imperil the banking interests of the country." See also, 3 R. C. L., 549.

In the case at bar, the bank knew that the funds deposited with it in the name of B. T. Frierson, as administrator of the estate of Willie McRay, did not belong to Frierson personally, but were trust funds. It is conceded that, in the misappropriation of these funds by the fiduciary, as was done, the bank acted in good faith in the transaction, and that it did not profit in any way by reason thereof. The question is, did it have constructive knowledge that the fiduciary was perpetrating a fraud, and by its acts assisted him in accomplishing the misappropriation of the trust funds? If so, it is liable for the loss sustained.

C. A. Spivey, president of the bank, testified that Frierson, as administrator of the estate of Willie McRay, made the deposit of $5,000.00; that the following notation was made on the original deposit slip and on the margin of the statement sheet, "checks to be countersigned by L. D. Magrath, attorney in fact"; that thereafter, at different times, Frierson personally presented at the window of the bank several checks issued by him as such administrator and countersigned by Magrath, as attorney in fact; that these checks were made payable to the order either of Arthur McRay or of Sana Montgomery, bore the purported indorsement of the named payee and also the indorsement of Frierson himself. He further stated that the bank did a good deal of business with Frierson, and that it required him,

when he issued a check as postmaster or service officer to any person or veteran not known to the bank, to come and "identify the name or come and identify the man"; that on the occasions of the cashing of the checks in question, Frierson appeared at the bank's window in person and presented the checks himself for payment; that he was the depositor, the administrator, and the drawer of the checks, and represented to the bank, upon inquiry by it, that the indorsements were genuine, and, in the circumstances stated, the bank felt justified in accepting his word thereabout; and, so far as the witness could recall or determine from the bank's records, Frierson was paid in cash each time.

We do not think that the admitted facts and circumstances constituted constructive notice to the bank that Frierson, the fiduciary, in seeking to have the checks paid as he did, intended to perpetrate fraud upon the estate. It is true that where a check is made payable to a named person, or to his order, the bank is bound to ascertain the identity of the person named as payee, or, if the check is presented by an alleged indorsee, the bank must ascertain the genuineness of the indorsement. In the present case, however, as the facts show, the bank was paying the money to Frierson, the depositor, on checks issued by him as administrator, duly countersigned by the attorney in fact of the appellant, and presented to the bank for payment by Frierson himself, who assured the bank that the indorsements of the named payees were genuine; and the bank had a right to assume, as the authorities hold, that the fiduciary would apply the trust funds to their proper purposes under the trust. We hold, therefore, that the bank was not guilty of any wrong or negligence in its payment of the checks. Frierson's plan to defraud the estate, as already pointed out, was rooted in his official acts; and, as the appellant, as surety on his bond, stood sponsor for the official conduct and integrity of its principal, the trial Judge properly disposed of the matter as he did. For if the casualty company, as it might have

done, had made the shortage of its principal good, the equities being in favor of the bank, the company would have had no right of subrogation as against that institution. There was no error, therefore, in granting the nonsuit.

The appellant finally contends that the trial Court committed error "in excluding secondary evidence of a joint control-agreement when the form of such agreement had been established and the bank had admitted in writing that the agreement was in existence and the original had been lost."

We do not think there is any merit in the contention. The testimony does not show that any joint control agreement was ever executed and delivered to the bank. It does show, however, as already stated, that Magrath, as attorney in fact, was required to countersign the checks, and that a notation of that fact was made on the original deposit slip and on the margin of the statement sheet. The bank, therefore, agreed to that much, and, if it had paid a check that Magrath had not countersigned, it would have done so at its own peril. It is true that the bank admitted in writing the existence of a countersignature agreement, and that the president of the bank testified that the account was subject to joint control. All of this, however, was in reference no doubt to the understanding that no checks issued by Frierson, as administrator, should be cashed, except and until they were countersigned by L. D. Magrath, as attorney in fact. When C. A. Spivey was on the stand, he testified as follows:

"Q. Do I understand that the deposit slip bore that language and that was for the purpose of putting the bank on notice that some company or individual represented by Mr. Magrath as attorney-in-fact exercised joint control over the account? A. Our records do not indicate that we had any other notice except the words of the administrator when he opened the account.

"Q. I am asking you of the notation on the deposit slip? A. It does so.

"Q. That placed you on notice from the time the account was opened that some company or some individual for whom Mr. Magrath was attorney-in-fact had an interest in the account? A. Correct, we understood that notation meant he would countersign the checks."

On this point, L. D. Magrath, witness for the appellant, was asked whether he recalled the execution of a joint control agreement between the bank and the company, to which he replied that he did not remember the details of the execution of the joint control at all, but that the company had a form which prescribed such control to be exercised, and that is sent to the bank. Upon objection by counsel for the bank that the best evidence would be the original form itself, the following took place:

"The Court: I understood him to say that the bank had such a form. Did you give the bank such a form in this case? A. I don't remember specifically giving them a form in this case. As a matter of fact that detail is not in my memory.

"Q. Did you ever make a verbal agreement as to joint control? A. No, I don't. Since—

"The Court: You just answer his question. You say you did not.

"Q. You say the Maryland Casualty Company has forms requiring joint control agreement? Is that form returned to you when it is signed? A. Yes.

"Q. Have you searched your office for the joint control agreement involved in this Willie McRay estate? A. Yes, I have.

"Q. Have you been able to find it? A. No, I have not.

"Q. I hand you a form in blank. Is that the form which Maryland Casualty Company supplies you to be executed on its behalf and by the bank? A. Yes, it is a regular form.

"Q. Although you haven't been able to locate the form in this case, you would say—

"Mr. Suggs: We object. It is leading.

"The Court: Have you said yet that you had the bank execute such a form? A. I don't remember at all the execution of a form.

"The Court: Then I don't think you can prove the contents of it. The very basis of the whole thing is that the bank executed it. Whether he can find it or not, it may never have existed."

If the appellant had offered testimony to the effect that a form of a joint control agreement of the account had been executed by the company and the bank in writing, and that such paper had been lost and could not be found after diligent search therefor, its contents could have been proved by secondary evidence. But as there was no proof of such fact, if fact it was, the ruling of the trial Judge thereabout was undoubtedly correct.

While we have fully considered the several questions stated and argued by the appellant, Exceptions 1, 2, and 3, especially 2, are objectionable as to form. We have recently, in several opinions, called attention to this violation of the Court's rules; and, if persisted in, counsel for appellant will have no ground for complaint if penalties are imposed.

The appellant Bernice H. Frierson, as administratrix of the estate of Benjamin T. Frierson, complains of error on the part of the trial Judge in refusing her motion for a directed verdict made upon the ground "that the action was brought within less than one year from the date of Benjamin T. Frierson's death"; the contention being that this is an action "for an accounting against a deceased administrator," Frierson, and is one for debt attempted to be brought in violation of the statute. See Section 418 of the Code of 1932.

We think, however, as held by Judge Gaston in passing upon the demurrer of this appellant, that this is "not strictly a suit on a debt." It seems clear, so far as this appellant is concerned, that the action is one for the fraudulent breach

of contract which is a tort. *Dyson v. Commonwealth Life Ins. Co.,* 176 S. C., 411, 180 S. E., 475. And we have held that "a right of action for a tort is not a debt," and that Section 418 of the Code above cited, which prohibits suits against an executor or administrator "for the recovery of the debts due by the testator or intestate, until twelve months after such testator's or intestate's death," does not apply to actions for tort committed by the decedent. *Newman v. Lemmon et al.,* 149 S. C., 417, 147 S. E., 439. It is suggested by counsel in his brief that, if this be construèd as an action in tort, the right of action would not survive under Section 419 of the Code against the personal representative of the deceased person. This question was not made the ground of any objection, motion, or demurrer in the Court below, and was not there passed upon. It is not, therefore, properly before us, and we express no opinion thereabout.

The appellant's final contention that a verdict should not have been directed against her in favor of the plaintiffs is also without merit. The only reasonable inference to be drawn from the testimony, as we read it, is that no part of the trust funds was ever paid to or received by the distributees of the estate; but that Frierson, the appellant's decedent, misappropriated such funds in violation of this trust. The trial Judge, therefore, properly directed a verdict, as was done.

All exceptions of both appellants are overruled, and the judgment of the Circuit Court is affirmed.

MESSRS. JUSTICES BONHAM, BAKER and FISHBURNE concur.

MR. JUSTICE CARTER did not participate on account of illness.