18381

The SOUTH CAROLINA NATIONAL BANK OF CHARLESTON, Respondent, v. LAKE CITY STATE BANK and Hartford Accident & Indemnity Company, Appellants.

(143 S. E. (2d) 584)

288

*Messrs. D. Laurence McIntosh* and *Wright, Scott, Black-well & Powers,* of Florence, and *S. Russell Floyd,* of Lake City, *for Appellants,*

*Messrs. F. Dean Rainey,* of Greenville, and *Sinkler, Gibbs & Simons,* of Charleston, *for Respondent,*

*Messrs. D. Laurence McIntosh* and *Wright, Scott, Black-well & Powers,* of Florence, and *S. Russell Floyd,* of Lake City, *for Appellants, in Reply,*

July 20, 1965.

BRAILSFORD, Justice.

This action is a sequel to an action by W. Wesley Single-tary & Son, Inc. (Singletary) against Lake City State Bank (Lake City) to which we first refer.

Over a period of years, a job foreman employed by Single-tary caused checks to be issued on padded payroll records and cashed them on forged endorsements at various banks, including The South Carolina National Bank of Charleston. These checks were forwarded to Lake City and charged by it to Singletary's payroll account. Upon discovery of the forgeries, Singletary sued Lake City for the aggregate of these debits. Lake City notified the forwarding banks and sought unsuccessfully to have them made parties. It also answered setting up certain affirmative defenses, by which it

claimed that its depositor was barred of recovery, and, as an alternative, it claimed, on equitable principles, the right to offset an amount allegedly paid to Singletary by an insurance company under a fidelity bond insuring it against loss from employee defalcations.

Taking the position that the transaction between it and the insurance company, as evidenced by a written agreement between them styled a loan receipt, was a loan instead of payment of a covered loss, Singletary moved to strike the equitable defense as sham and frivolous. This motion was granted by the circuit court and we affirmed. *W. Wesley Singletary &Son, Inc. v. Lake City State Bank,* 243 S. C. 180, 133 S. E. (2d) 118.

After remittitur, the *Singletary case* was tried on the issues raised by the complaint and the remaining affirmative defenses of Lake City's answer, including the defense that the checks were payable to fictitious persons and, hence were bearer paper. All issues were submitted to the jury which found a verdict for Singletary for $14,964.64, the aggregate amount of the checks. After entry of judgment, Lake City paid the amount of the verdict plus a compromise of the interest, totaling $16,500.00. Thereupon, Lake City made demand for payment upon the various banks who were prior endorsers of the checks. The present action by The South Carolina National Bank of Charleston (SCN) against Lake City and Hartford Accident & Indemnity Company (Hartford), Lake City's forgery insurance carrier to a limit of $10,000.00, followed.

The complaint alleges that Hartford, as a paid insurer, has indemnified Lake City for its loss arising from the fraudulent checks under a so-called loan agreement and that both defendants have threatened SCN with suit on its endorsements, in the name of Lake City but for the benefit of Hartford. According to the complaint, the loan agreement is a legalistic device employed for the inequitable purpose of depriving plaintiff "of an equitable defense long ingrained in South Carolina law and exemplified by the holding of the

Supreme Court in the case of *Rivers v. Liberty National Bank,* 135 S. C. 107, 133 S. E. 210, which holds that in the absence of other equities a paid surety has not the right to recover against an innocent bank or its equally innocent depositor. The plaintiff is informed and believes that by reason of the decision of the Supreme Court in the case of *W. Wesley Singletary & Son, Inc. v. Lake City State Bank,* [243 S. C. 180,] 133 S. E. (2d) 118, decided on October 31, 1963, it no longer has the right to plead this equitable defense to an action at law brought by Lake City for the benefit of Hartford, notwithstanding that under a former decision of the South Carolina Supreme Court supported by overwhelming weight of authority elsewhere, this equitable defense could have been pled as a bar to an action at law brought by Hartford."

Alleging that it can "maintain its time honored defenses against the paid surety only through the means of this action," the complaint prays for an injunction against Hartford from suing in the name of Lake City and against Lake City from lending its name to any such action.

Hartford demurred to the complaint for insufficiency of facts to constitute a cause of action. Lake City filed an answer by which, among other defenses, it denied that any insurance carried by Lake City absolved SCN of its liability as endorser on ninety-six checks totaling $5,952.19. Lake City also filed a counterclaim against SCN for the aggregate of the checks which SCN had collected from it and for which it had been held liable to its depositor.

By its reply to the counterclaim, SCN, among other defenses, alleged that the checks in question were bearer paper because the payees of the checks were in law fictitious persons since "the person who made or drew the checks was an agent and employee of W. Wesley Singletary & Son, Inc., whose knowledge is imputable to the said Singletary Company and who did not intend that the named payees in the checks in question should receive the checks nor the respective proceeds thereof."

After the pleadings were completed, the parties entered into a stipulation of facts necessary to a decision on the counterclaim and agreed that the entire matter be presented to the circuit court "for a decision on the merits as to whether or not Lake City and/or Hartford can recover of South Carolina and if so, in what amount."

The circuit court sustained the claim that the checks were bearer paper which required no endorsement. Since this absolved the SCN of liability on its guarantee of prior endorsements, the court found it unnecessary to pass on any other issue. By appropriate exception, Lake City and Hartford have challenged this conclusion.

Section 8-820(3), Code of 1962, which is part of the Negotiable Instruments Law, provides that an instrument is payable to bearer "[w]hen it is payable to the order of a fictitious or nonexisting person and such fact was known to the person making it so payable." When the maker or drawer of the check does not intend that the person named as payee should have any beneficial interest therein, the check is payable to a fictitious payee within the meaning of the statute even though an existing person is named. *Southern Frozen Foods, Inc. v. Hill,* 241 S. C. 524, 129 S. E. (2d) 420; *Bourne v. Maryland Casualty Co.,* 185 S. C. 1, 192 S. E. 605, 118 A. L. R. 1.

The circuit court's decision that the checks were bearer paper rested on its conclusion that the foreman was "in point of law the real maker of the checks." Hence, his intention, as that of "the person making (them) so payable," was controlling under the terms of the statute. We quote from the stipulation of the parties:

"Between January 1, 1956, and December 31, 1960, W. Wesley Singletary & Son, Inc. (hereinafter referred to as Singletary), a South Carolina corporation in the general contracting business in Lake City, was engaged in jobs requiring the employment of numerous personnel in Charleston, Walterboro and Lake City. Ordinary employees were paid on a weekly basis by checks drawn on its payroll ac-

count with Lake City State Bank (hereinafter referred to as Lake City), in Lake City, South Carolina. The payroll checks were prepared in the Lake City office of the Company on the basis of time records furnished by the job foreman at the various construction sites. At some time during this period one of the Company's foremen made up time records for employees during a period when they were laid off or after they had been discharged. Time records were forwarded to the Lake City office of the company and payroll checks prepared. Paul S. Singletary and Sarah B. Singletary signed the payroll checks in question as officers of the Company, thinking that the payees thereon were actually in their employ. The checks were then sent to the job foreman for distribution. The foreman took the checks in question, forged the payee endorsements, cashed the checks at various places and made personal use of the proceeds."

The following applicable principles quoted from 11 Am. Jur. (2d), Bills and Notes, Sections 133 and 134, are fully supported by decisions cited in the footnotes and require reversal.

"* * * An instrument payable to a fictitious or nonexisting person or a person having no interest therein is not payable to bearer if the person making the instrument so payable (usually the maker or drawer) does not know that the payee was fictitious, nonexisting, or without any interest * * *. (Page 171)

"* * * Thus, it may be said generally that it is the knowledge and intention of the maker or drawer, or actual signer, and not that of one who induced him to draw the instrument, which is controlling. However, the 'drawer' or 'maker' of an instrument and 'the person making it so payable' can be and frequently are different, and in such case it is the knowledge of 'the person making it so payable,' as distinguished from the 'maker' or 'drawer,' which actually controls. The 'person making it so payable' is the person who actually made the instrument so payable, whether he is the nominal maker or not, so long as he is the responsible creator of the

paper—the person by whose authorized act the instrument is brought into existence * * *. (Page 173)

"* * * It is a general rule that where an employee or agent who has authority to draw negotiable paper draws paper payable to a nonexisting or fictitious payee, or a person not intended by him to receive it, such paper is, as to the employer or principal, payable to bearer, and the bank or person paying it on the indorsement of such payee's name is protected, and the loss will fall on the employer or principal. Such an agent or employee is the person making the instrument so 'payable' or, as some cases say, his knowledge is imputable to his principal or employer. On the other hand, where an employee or agent without authority to draw negotiable paper has his employer or principal ignorantly sign paper payable to a nonexisting or fictitious payee, and forges such payee's name, such paper is not payable to bearer, and the bank or person taking the paper on such forged indorsement has no title. When an agent or employee abandons the object of his agency and acts for himself in committing a fraud upon his principal, his capacity as agent ceases and his knowledge is not imputed to his principal * * *." (Pages 174, 175)

To same effect, see 10 C. J. S., A Bill and Notes § 129, page 580; Britton, Bills and Notes, 2 Ed., 1961, Section 149, page 427.

By clear inference from the stipulation, the officers of the corporation deliberately reserved to themselves the authority to sign checks and withheld such authority from the job foreman. His duty to prepare and present time records, from which payroll checks were drawn for signing by the officers, involved no discretion and could just as well have been delegated to a clerk or timekeeper. The foreman's only authority upon receipt of the checks was to distribute them among the named payees. In this respect, he was a mere conduit between the corporation and the workmen entitled to wages. This authority to deliver was clearly not the equivalent of authority to circulate or utter.

The contention of counsel that the intention of the foreman should control because the only intention which the officers had in signing the checks was to comply "with the directive of their employee" is unsound. The officers thought that the payees named in the checks were entitled to wages and they intended to issue the checks to such persons in payment for services rendered to the corporation. It is beside the point that the checks were made up from records furnished by the foreman. The officers were the persons making the checks "so payable" and they were in ignorance of the foreman's perfidy. Having no authority to issue checks, the foreman could not become the person *making* them "so payable" by procuring their issuance by others having such authority. See apposite comment by annotator, 118 A. L. R. 35. See also Annotation, 146 A. L. R. 848.

The circuit decree and counsel for respondent rely heavily upon the lengthy and comprehensive opinion in *Goodyear Tire & Rubber Co. v. Wells Fargo Bank & Union Trust Company,* 1 Cal. App. (2d) 694, 37 P. (2d) 483, in which the decision of the trial court that the checks involved were not bearer paper under the statute was reversed. The decision turned on facts not involved here, and is entirely compatible with the result which we reach. In fact, the court expressly declared that if the dishonest employee had not had authority to sign checks, which is this case, the trial court's conclusion that the checks were not bearer paper would have been affirmed.

"It will readily be understood, therefore, that if in the instant case the employee, Downs, *had no authority to sign checks,* the questions here presented could be answered completely by the *Home Savings Bank Case, supra,* and the judgment of the trial court would be correct * * *." (Emphasis added.) 37 P. (2d) 488.

The precedent referred to in the foregoing quotation is *Los Angeles Investment Co. v. Home Savings Bank,* 180 Cal. 601, 182 P. 293, 5 A. L. R. 1193. The facts involved

were strictly analogous to those of this case. The dishonest employee, one Emory, was manager of plaintiff's fire insurance department. Having no authority to sign checks, he prepared a series of requisitions for checks in payment of ostensible claims against the company which did not exist. The checks were issued by the accounting department and transmitted to Emory for delivery to the payees. He forged endorsements and realized on the checks in various ways. This action was brought by Emory's employer against the bank by which the checks were paid and charged to the employer's account. As to the bank's defense that the checks were bearer paper, the court said:

"* * * Emory did not execute the checks on behalf of the company. It is the intention of the officers who did that must be taken to be the intention of the company. The execution of the checks was one within the scope of their authority, not within that of Emory. As to these officers, it is plain that they did not intend to execute checks to fictitious parties or to pay money to the person to whom Emory intended it should be paid, to wit, himself. They intended to pay money to what they believed to be existent persons, and, this being so, the checks cannot be considered as made to fictitious payees."

This interpretation of the relevant provision of the Negotiable Instruments Law has the support of the overwhelming weight of authority. No well considered case in which a contrary conclusion has been reached on analogous facts has come to our attention.

Interestingly, since this case arose, Section 8-820 has been amended by providing that an instrument is payable to bearer if the employee or agent who supplies the name of the payee to the maker knows that the payee is fictitious, even though the maker of the check is ignorant of that fact.

In view of our conclusion that the checks in question were not payable to bearer, it is unnecessary for us to consider appellants' only other exception, which rests on the claim that SCN was estopped by the judgment

in the *Singletary case* from questioning that the checks in question were payable to order.

The remaining question is whether the judgment below may be affirmed on the additional sustaining ground duly served by SCN, which we quote:

"Inasmuch as the facts establish that SCN was guilty of no negligence in cashing the checks of Singletary drawn to payees, whose names were forged, and was therefore innocent, equity will enjoin a paid indemnitor from any action which would deprive SCN of the time honored defense that, absent other equities, a paid surety may not recover directly or indirectly from an innocent bank and therefore should be enjoined from entering into any agreement or pursuing any action which would deprive SCN of this defense."

The judgment appealed from dismissed the counterclaim of Lake City against SCN on what we have held to be the erroneous theory that the checks in question were payable to bearer. Hartford has paid or advanced to Lake City only $10,000.00 of $16,500.00 paid by Lake City to Singletary. Therefore, Lake City is the real party in interest and is entitled to maintain its counterclaim without regard to or reliance upon the loan agreement between the parties. *Pringle v. Atlantic Coast Line R. Co.,* 212 S. C. 303, 47 S. E. (2d) 722; *South Carolina Electric & Gas Co. v. Aetna Life Insurance Co.,* 230 S. C. 340, 95 S. E. (2d) 596. Whether or not SCN is entitled to relief against so much of Lake City's demand as would otherwise inure to Hartford's benefit is not now before us. The sustaining ground does not challenge Lake City's right to recover judgment on the counterclaim in some amount. Therefore, it puts forward no ground on which the dismissal of the counterclaim may soundly be sustained.

Reversed and remanded for further proceedings consistent herewith.

TAYLOR, C. J., and Moss, LEWIS and BUSSEY, JJ., concur.