Argued February 10; affirmed March 23; rehearing denied
April 20, 1943

# PORTLAND POSTAL EMPLOYEES CREDIT
# UNION *v*. UNITED STATES NATIONAL
# BANK OF PORTLAND

(135 P. (2d) 467, 136 P. (2d) 259)

Before BAILEY, Chief Justice, and BELT, ROSSMAN, KELLY, LUSK, BRAND and HAY, Associate Justices.

*Wilber Henderson,* of Portland (Platt, Henderson, Warner & Cram, of Portland, on the brief), for appellant.

*S. J. Bischoff,* of Portland (George W. Mead, of Portland, on the brief), for respondent.

BAILEY, C. J. This action was brought by the plaintiff, Portland Postal Employees Credit Union, a corporation, to recover from the defendant, United States National Bank of Portland, a national banking association, the sum of $8,850 as the aggregate of

twenty-one checks drawn by the plaintiff on its checking account with the defendant in favor of various payees whose names as endorsers were, without the knowledge of such payees, placed on the checks by the treasurer of the plaintiff corporation, who presented seventeen of the checks to the bank and received payment on them. From a judgment in favor of the plaintiff in the sum of $7,500, with interest thereon and costs, the defendant has appealed.

The plaintiff corporation was organized prior to February 1, 1931, under chapter 396, General Laws of Oregon 1929, providing for the organization of credit unions, and was functioning under that law and the amendments thereof at all times herein mentioned. The membership of the union is made up of employees of the postal service and "men who are janitors or engineers in the post office building" in Portland. The principal business of the corporation is the collection of funds from members and the loaning of money to members. Its officers are: a president, a vice-president, a secretary, a treasurer, a board of directors consisting of twelve members, a credit committee of five members and a supervisory committee of four members. At the times herein mentioned none of the executive officers or members of the board or committees received any compensation for services, except the treasurer.

All applications for loans to members were required to be in writing and to be passed upon by a majority of the members of the credit committee. Loans were granted only if unanimously approved by the members of the credit committee present.

On or about February 1, 1931, the plaintiff established with the defendant what is "commonly known

as a checking or business account," subject to withdrawal on checks signed by certain officers of the plaintiff. All checks drawn on the defendant bank by the plaintiff were required to be signed by the treasurer and either the president or the vice-president of the credit union. Edgar Zehrung was the treasurer of the credit union from the time of its incorporation until July 19, 1940, when he was discharged on discovery by other officers of the corporation of his embezzlement of the credit union's funds. While serving as treasurer, Zehrung was paid a salary and acted as the general manager of the plaintiff credit union. Among his duties were the depositing of all the plaintiff's funds in the bank and the withdrawing of money on properly signed checks for the cashing of pay checks of members of the credit union.

It was also Zehrung's duty, when any member desired to obtain a loan from the credit union, to supervise the preparation of a written application therefor and the execution of a promissory note by the applicant, and to present the application to the credit committee. On the committee's approval of the application, Zehrung was required to present both the application and the note to the president or vice-president of the credit union, accompanied by a check for the signature of either officer, drawn on the defendant bank for the amount of the loan granted and payable to the applicant.

From June 26, 1936, to April 18, 1940, both dates included, Zehrung prepared twenty-one purported applications and promissory notes for loans to members of the credit union, on twenty of which applications and notes he placed the signatures of members of the credit union. He presented all the applications

to the credit committee, which in each instance approved a loan to the member named in the application. Upon such approval, Zehrung presented the application and the member's note to the president or vice-president of the plaintiff, together with a check for that officer's signature, in the amount of the loan granted, which check was signed also by Zehrung as treasurer.

Of the twenty-one checks, four, aggregating $1,350, were withdrawn from the consideration of the jury. One of the four was so withdrawn by the plaintiff, for the reason that the payee therein named actually received the proceeds thereof; and in addition it did not appear definitely that the payee's signature was not written by himself on the application and note. The other three checks were withdrawn by the court from the jury's consideration, because the proceeds thereof were deposited in the account of the credit union.

The remaining seventeen checks were presented by Zehrung at the teller's window of the defendant's bank, and the amount of the check in each instance was paid to him and charged to the plaintiff's account. The name of the payee was written by Zehrung as the endorser of each such check. On thirteen of the checks there was no other endorsement. Two of the remaining four were thus stamped on the back, under the name of the payee:

"Pay to the order of The United States National Bank

"1416 Portland, Oregon 1416
"Portland Postal Employees Credit Union".

One other bore the name of "Portland Postal Employees Credit Union" affixed by rubber stamp, in addition to the purported endorsement of the payee.

And the remaining check was endorsed by "Edgar Zehrung, Treas.", below the purported signature of the payee.

Thirteen of the seventeen checks were cashed by the same teller, Mr. Harbaugh, and all the four remaining checks were apparently cashed by different tellers. The testimony of Mr. Harbaugh and three other tellers was taken by deposition. Each of such tellers testified that he did not know the payees named in the checks, or their signatures; that he did not look to see whether the checks had been endorsed by the respective payees or by Zehrung, who presented them for payment; and that he made no inquiry of Zehrung concerning the payees or the genuineness of their signatures, or concerning Zehrung's right to cash the checks. The smallest amount of any such check was $200. Three of the checks were for $800 each, two for $600, and one for $500.

Each of the tellers whose deposition was taken and another employee of the bank, who was called as a witness by both the plaintiff and the defendant, testified that it was customary in the defendant's bank to require any one presenting for payment a check drawn in favor of a payee other than himself to add his endorsement to that of the designated payee, although in some instances checks were cashed without requiring such further endorsement.

The plaintiff alleges in its amended complaint that the loss sustained by it through the cashing of the forged checks "was due to the careless and negligent conduct of the defendant . . . in performing the terms and conditions of the contract on its part to be performed." The "careless and negligent conduct of the defendant" as set forth consisted in paying

the seventeen checks bearing forged endorsements, and the honoring of such checks without knowing the payees named therein, or their signatures, without attempting to ascertain the genuineness of the purported endorsements, without requiring Zehrung to add his endorsement to the checks, and without attempting to ascertain whether Zehrung was authorized to present the checks and receive the proceeds from them.

The defendant denies the allegations as to its carelessness and negligence and sets forth three affirmative answers. The first such answer is to the effect that the checks here involved were payable to fictitious persons, in that it was never intended that the payees therein named should receive any part of the respective checks.

The second affirmative answer alleges that the payees named in the checks were not, at the time the checks were drawn, creditors of the plaintiff, were not borrowers from the plaintiff and as to such payees "there was no subsisting obligation on the part of the plaintiff"; that Zehrung had made out the checks for the purpose of presenting the same himself for payment, without any intention that such checks should ever be delivered to the payees therein named; that the checks were drawn and signed by Zehrung and the president of the plaintiff corporation without authority for so signing the same; and that Zehrung "forged plaintiff's name to said checks, and all of said checks constitute forged withdrawals on plaintiff's account".

It is further alleged in the second affirmative answer that all the checks were presented to the defendant bank and were "honored and paid before the

first day of May, 1940, without the defendant's knowing or having any way of knowing that said checks had not in reality been authorized by plaintiff, but that the plaintiff's name had been forged thereto''; and that all such checks in canceled form or the vouchers representing payment to the respective payees were returned to the plaintiff before May 15, 1940; that the plaintiff did not notify the defendant in regard to such checks and the unauthorized making and cashing thereof until about August 1, 1940, more than thirty days after the return of such canceled checks and vouchers to the plaintiff; and that by reason of such delay the plaintiff is barred by § 40-1009, O. C. L. A. ''from maintaining this action, or making claim upon said forged checks.''

The third affirmative answer alleges that of the moneys received by him from the seventeen checks, Zehrung deposited to the credit of the plaintiff in the defendant's bank ''the aggregate sum of approximately $2,000 and the same constitutes an offset against any claim plaintiff may have against defendant on account of said checks''.

The denial of the defendant's motion for an involuntary non-suit at the close of the plaintiff's case in chief, and the denial of the defendant's motion for a directed verdict in its favor at the close of the case, form the basis of the first three of the appellant's five assignments of error. The reasons set forth in support of the motion for involuntary nonsuit were the same as those stated for requesting a directed verdict.

■ A motion for a directed verdict presents for decision the same question that is raised by a motion for a judgment of non-suit. The plaintiff, however, is

entitled, on a motion for a directed verdict, to the benefit not only of his own testimony, but also of any evidence favorable to him introduced by the defendant: *Ridley v. Portland Taxicab Co.*, 90 Or. 529, 534, 177 P. 429; *Carty v. McMenamin & Ward,* 108 Or. 489, 501, 216 P. 228; *Hudelson v. Sanders-Swafford Co.,* 111 Or. 600, 608, 227 P. 310.

 A motion for a non-suit or for a directed verdict admits the truth of the plaintiff's evidence and of every inference therefrom that can reasonably and legitimately be drawn. In passing upon such motions the evidence must be considered in the light most favorable to the plaintiff. The court is not concerned with any conflict in, or the weight of, the evidence. The question for determination is only whether there is any substantial evidence to support the judgment: *Lammers v. Hinsdale,* 146 Or. 355, 362, 30 P. (2d) 335; *Keys v. Griffith,* 153 Or. 190, 196, 55 P. (2d) 15; *Bond v. Graf,* 163 Or. 264, 268, 96 P. (2d) 1091. As to the first three assignments we need consider only the alleged error of the court in denying the defendant's motion for a directed verdict.

The first assignment of error is to the effect that the circuit court should have granted the defendant's motion for a directed verdict "for the reason that it was established by the pleadings and the evidence received that the checks upon which this action is based were made out in favor of fictitious payees (persons that the maker did not intend should receive the checks), and that such checks were payable to bearer under section 69-109, O. C. L. A., and the bank, therefore, was authorized to and did properly pay the same." Section 69-109, O. C. L. A., provides in part that: "The instrument is payable to bearer

. . . (3) when it is payable to the order of a fictitious or non-existing person, and such fact was known to the person making it so payable''.

■ By the great weight of authority, a check payable to an existing person who is not intended to have any right to or interest·in it or its proceeds and that fact was known to the maker of the check, is payable to bearer: 10 C. J. S., Bills and Notes, § 129, page 581; 5 R. C. L., Checks, § 22, page 497; *Bourne v. Maryland Casualty Company*, 185 S. C. 1, 192 S. E. 605, 118 A. L. R. 1. The defendant would extend this principle of law to the instant case, although the checks involved herein were those of a corporation and required multiple signatures in order to be valid.

In support of its assertion that the checks here under consideration were payable to bearer, the defendant contends that within the meaning of § 69-109, *supra*, Zehrung was ''the person making'' them payable to designated members of the plaintiff credit union; that he did not intend such members to have any interest in the same; and that the president or vice-president who also signed the checks did so merely as an ''automaton'' or a ''dummy''. On this point the defendant cites and relies upon the following cases: *Goodyear Tire & Rubber Co. v. Wells Fargo Bank & Union Trust Company*, 1 Cal. App. (2d) 694, 37 P. (2d) 483; *Union Bank & Trust Company v. Security-First National Bank*, 8 Cal. (2d) 303, 65 P. (2d) 355; *Security-First National Bank v. Bank of America*, (Cal. App.) 129 P. (2d) 424; *Globe Indemnity Co. v. First National Bank*, (Mo. App.) 133 S. W. (2d) 1066; *National Surety Corporation v. Federal Reserve Bank*, 161 Misc. 304, 292 N. Y. S. 607, affirmed without opinion, 250 App. Div. 754, 296 N. Y. S. 240;

*Pennsylvania Co. v. Federal Reserve Bank,* 30 F. Supp. 982; *United States v. Bank of America,* 47 F. Supp. 279.

Of the cases on which the defendant relies to support its contention, the first decided, which seems also to have been the basis of most of the defendant's other cases, was *Goodyear Tire & Rubber Company v. Wells Fargo Bank & Union Trust Company,* supra. The opinion therein was rendered by the district court of appeal of California. A hearing was denied by the supreme court of that state.

In that case the Goodyear company in 1919 transferred Downs, one of its employees, from Akron, Ohio, to California. From that year until 1926 Downs was the manager of the company's accounting department and in addition held the offices of cashier, treasurer and comptroller. In the conduct of its business the Goodyear company "frequently became obligated to its customers, of which it had approximately 20,000 on its books, for credit balances in favor of the latter which might arise from goods returned, claims and replacements, discounts and in other ways. Upon determination of a credit balance" the Goodyear company "would draw a check to the customer and thus discharge the same. All records involving these credit balances were kept directly under" the supervision and control of Downs, "and it was also part of his duties to attend to the payment and discharge of the same".

Two signatures were required on all checks drawn by the Goodyear company, and one of the signatures authorized was that of Downs. During the period from 1921 to 1926 Downs created on the books of his employer "fictitious accounts and by various means caused fictitious credit balances to be set up on the

books to these fictitious accounts''. Checks to discharge such fictitious obligations were caused by Downs to be prepared. Downs, or a clerk under his supervision, ''would make the routine memoranda, requisition, ledger cards, sales ledger and journal slips, and do any other things required by the bookkeeping routine as conditions precedent to the drawing of a check. The check would then be typed and presented with the necessary supporting documents, all of which when prepared appeared to be regular on their face, to the cosigners of Downs. The cosigners, in reliance upon'' the company's established system, ''and being satisfied that the supporting documents were in order, would sign the checks. When the checks were presented to Downs' cosigners, supporting documents were not always presented.'' When the checks in question were completed, Downs stole them, endorsed on them the names of the fictitious payees and cashed the checks. During the period of his defalcations the Goodyear company issued regularly between three thousand and five thousand checks per month.

After reviewing many authorities as to what constitutes a check payable to bearer, the court therein observed:

''* * * The specific question which is presented then is whether the intention of Downs, who was authorized to draw checks, to have said checks drawn in favor of fictitious payees is binding upon the maker of the checks, to-wit, the corporate principal, irrespective of the fact that it was necessary for said checks so drawn by Downs to be cosigned by some other employee or officer of respondent. This question has never been decided.''

With the particular facts of the case before it in mind, the court further stated:

"On the facts of this case the cosigners of Downs were mere automatons. Their names on the instruments gave them no more validity than did the corporate name printed thereon. They had just as much general intent with reference to the instruments involved as their corporate employer, and no more. For all practical purposes their names as well as that of the corporation might have been printed upon the checks. It is difficult to understand why any insurmountable legal barrier is created merely because on the facts in this case cosigners were required to affix and went through the motions of affixing their names at the time the checks were in the process of being drawn. If the cosigners had signed the checks in question in blank, then based upon every rule of reason and on the clear authority of the San Carlos case, *supra*, the checks were 'bearer' checks. It would be no answer to say that authority to sign in blank was not given, for the act of signing would be within the scope of the authority of the cosigners. The facts in this case establish beyond cavil that the cosigners did, as a practical matter, sign in blank."

In answer to the possible suggestion that when a corporation confers upon one of its employees the power to do an act, that power cannot be delegated to another, the court stated that that question was not involved in the case, and continued as follows:

"* * * The cosigners with Downs each exercised their power, but did it in a manner so careless that the corporate employer would have been as secure if no grant of power had ever been made to such cosigners to cosign checks."

As explanation of the statement last quoted the court further remarked:

"It has undoubtedly been noted that in the foregoing we have designated the exercise of authority

by the cosigners as 'in a manner so careless.' The phrase has been deliberately used, but it should be made clear that this decision is not rested upon negligence as such as between the respondent [the Goodyear company] and appellant. The use of the phrase is confined to the effect which we believe the conduct of the cosigners has in fixing the character of the checks involved as 'bearer' paper.''

After discussing the other cases cited by the defendant we shall point out how the facts in the case at bar distinguish it from the Goodyear case and others.

In *Union Bank & Trust Company v. Security-First National Bank*, supra, the supreme court of California adopted as its own the opinion of the district court of appeal, reported in 57 P. (2d), 1332. The facts in that case, briefly, are the following: The Union bank brought action against the Security bank to collect on twenty-two cashier's checks issued by the Union bank and cashed by the defendant, which in addition guaranteed all prior endorsements on the checks. The issuance of the checks by the Union bank was effected by one Williams, who was a director and assistant secretary of two corporations which maintained accounts in the Union bank. Under an arrangement between each corporation and the bank, two signatures were required on all checks issued by the corporations. Williams was one of the authorized cosigners of both companies' checks. He prepared checks to the order of the Union bank drawn upon the accounts of his employers, signed them himself and procured the necessary countersignatures. He then presented the checks to the Union bank and, instead of receiving cash for them, signed a written requisition for cashier's checks, all made payable to one of two individuals, ''both actual persons, either then or formerly known personally to'' Williams.

Thereupon Williams endorsed the cashier's checks, first in the name of the payee thereof and then in his own name, and deposited them in his own account in the Security bank.

The court therein held that the intention of the Union bank was to make the cashier's checks payable to fictitious persons. In this connection, it stated:

"* * * The appellant, Union bank, followed the instructions implicitly; it executed its cashier's checks to a payee designated by Williams, with the former of whom it was unacquainted, of whom it had no knowledge, and concerning whom it had no intent. Regarding the payee named, appellant had no interest save that of following Williams' instructions, and the latter's intent was that a fictitious payee be named. Authorized as Williams was to sign checks drawn on his employer's depositary, if he had cashed such checks and obtained money, surely it would not be contended that the depositary would be liable to the depositor. How, therefore, can the depositary be held liable when, instead of obtaining cash on the checks, the faithless employee obtained cashier's checks? The intended fictitious payee was the creature of Williams' mind, and while the appellant Union bank was the nominal maker of the cashier's checks, still Williams was the person who actually drew the bill and was the person making the cashier's checks payable to a fictitious payee."

*Security-First National Bank v. Bank of America*, supra, was decided by the district court of appeal of California. In that case one Ellis was the head of the accounting division of the trust department of the Security bank. He had no official title and no authority to sign checks as such employee.

Ellis prepared the checks in question, which were drawn on the plaintiff's trust department, signed by an

assistant trust officer named Hadley, and purported to be for payments due from trusts held by the plaintiff bank, to the order of "L. W. Bobbitt". There was such a person as L. W. Bobbitt known to Ellis, but he did not live in California, had nothing to do with the acts of Ellis, knew nothing of them, had no interest in the checks and was not intended by Ellis to have either the checks or the money obtained through them. After the checks were signed, Ellis obtained possession of them, endorsed on them the name of Bobbitt and deposited them in an account that he had opened in the defendant bank in the name of Bobbitt. The action was brought by the Security bank to recover from the Bank of America upon the latter's guaranty of all prior endorsements.

Hadley was known as the "signing officer" of the plaintiff. His sole function was to sign checks and other papers and documents coming from the trust department. He signed between eight hundred and fifteen hundred such papers daily. He "had no time to investigate the various transactions out of which they arose, to see if they were proper, and was not expected to do so, but acted on the assurances of others authorized to give them." When Hadley's signature on a check was desired, "the check fully made out was presented to him, together with a 'debit ticket' which showed the name of the payee, the purpose for which the check was drawn, its amount and the number of the trust involved." The checks there in controversy were prepared by Ellis and presented to Hadley for the latter's signature. Ellis, who was authorized to do so, signed the debit tickets and placed his initials on them following the statements "Authorized by" and "Funds O. K." In signing the checks Hadley relied entirely upon the information furnished to him by Ellis.

The reason for holding that the checks involved in that case were payable to bearer was thus stated by the court:

"Under the facts of the case at bar Hadley was in substantially the same situation as that given to the cosigners of Downs in the case just quoted [the Goodyear case]. Hadley did not even look at the names of the payees on a check and either he had no actual intent at all regarding them, or if he had any such intent it was, at most, to make the checks payable to the persons intended by Ellis, and was thus like that of the bank which issued the cashier's checks involved in Union B. & T. Co. v. Security-First Nat. Bk., *supra*, 1937, 8 Cal. 2d 303, 308, 65 P. 2d 355. There must be an intent somewhere as to the payee to be named in a check and if the signer of the check has none that intent must be sought elsewhere. If the plaintiff should use a check writing machine by which signatures were mechanically placed on checks, without any attention to the contents of the checks by the persons whose signatures were thus placed on them, it is obvious that such persons would have no intent whatever in regard to such checks and the intent of those authorized to operate the machine would have to be considered. Here Hadley was, at least as to payees' names, a mere machine, devoid of intent, and the intent which determines the character of the check, on the question whether the payee's name is fictitious, must be that of the one who operated the machine, in this case, Ellis."

The court then called attention to the fact that the plaintiff in the case before it relied upon *Los Angeles Investment Co. v. Home Savings Bank*, 180 Cal. 601, 182 P. 293, 5 A. L. R. 1193, as opposed to the conclusion reached by it. In that case one Emory, an employee of the plaintiff investment company, prepared

ostensible claims against his employer, procured checks based on such claims to be signed by authorized officers of the investment company and had them returned to his department, whereupon he endorsed the checks with the names of the purported payees and cashed them. It was therein held that the checks were not payable to bearer. In distinguishing that case from the one before it, the court observed:

"* * * In that case an audit was interposed between Emory, who prepared the demands, and the officers who signed the checks, the purpose of which was to determine whether the checks were proper or not. *The signing officers were not mere automatons but acted upon the results of such audit and it was quite proper to regard them as having an intent regarding the checks.* [Italics supplied.] But where the actual signer of the check has and in the nature of the operation can have, no intent at all as to the payee, as where he signs in blank (Rancho San Carlos v. Bank of America, *supra*, 1932, 123 Cal. App. 291, 11 P. 2d 424) or complies with the request of another, with no intent except to do what is asked (Union B. & T. Co. v. Security-First Nat. Bk., *supra*, 1937, 8 Cal. 2d. 303, 65 P. 2d 355), or is a mere automaton signing without intent (Goodyear Tire, etc. Co. v. Wells Fargo Bank, *supra*, 1934, 1 Cal. App. 2d 694, 37 P. 2d 483), it is obvious that the character of the check can not be determined on his nonexistent intent, and the controlling intent is that of the person who, within the scope of his authority, fixes the name of the payee. In this case that person was Ellis. It must be understood that our decision is based on the system, which was so set up by plaintiff as to eliminate from the duty of Hadley, as the actual signer of a check, any consideration of its propriety, and particularly to relieve him from any necessity of even looking at the payee's name. If he had any duty in these respects, but performed it

negligently or perfunctorily or even omitted to perform it at all on some particular occasion, a different result might follow."

In *Globe Indemnity Co. v. First National Bank*, supra, it was held that the "inference is warranted that" the cosigners of the faithless employee involved in that case "signed these checks as a mere matter of form, as the cosigner did in the California case", *Goodyear Tire & Rubber Co. v. Wells Fargo Bank & Union Trust Company*, supra. The opinion, however, took issue with the statement of the California case last cited, that, "Life is fused into the check by the one who finally signs", and thus proceeded:

"" * * * Where two signers are required, it takes the act of both to give the check validity, but what difference which signs first? At least in this case there was no understanding between plaintiffs' assignor and defendant bank as to who would appear on the check as first signer and who as second signer, but merely that they be signed by Kane and one other."

The cosigner of the defaulting employee in *Pennsylvania Co. v. Federal Reserve Bank*, supra, was, as stated by the court in its opinion therein, "a mere rubber stamp, had nothing to do with the issuing of the check, and no participation whatever in the vital matter —the intent with which it was put into circulation." She did what she was ordered to do by the employee who perpetrated the fraud.

In *National Surety Corporation v. Federal Reserve Bank*, supra, a motion was made to strike nine separate defenses from the answer. In one of the defenses it was alleged "that the drafts were never intended to be

delivered or payable to the persons named in them as payees and that, therefore, the drafts were payable to bearer." The court denied the motion to strike that defense and stated that, "Where the instrument is intended to go to a person other than the payee, it is payable to a fictitious person." The opinion gives so few of the facts that it is difficult to determine on what the decision is based, and it is therefore of little assistance in deciding the question here before us.

The facts in *United States v. Bank of America,* supra, are the following: Harry S. Howlett was employed by the United States as an accountant in the Sacramento office of the department of agriculture. His duty was to "audit, certify and approve for payment claims for indemnity made by owners of cattle condemned and slaughtered under the tuberculosis eradication program." Howlett procured a number of blank appraisal forms signed by the veterinarians who conducted the cattle testing program, completed the forms with names and addresses of nonexistent persons as owners, filled out and certified for payment the vouchers that authorized issuance of the checks concerned in the case, which were issued solely on information and certification furnished by him, and thereafter obtained and cashed the checks.

The court therein held that the law of California, in which state the checks were delivered and negotiated, determined the rights and liabilities of the parties litigant, and that under the authority of the Goodyear case and *Union Bank & Trust Company v. Security-First National Bank,* supra, the checks were payable to bearer. It further held that inasmuch as the United States did not notify the defendant for almost two and one-half years after the fraud had been discovered,

and waited another two and one-half years before bringing the action, it was barred from recovery, because it would be presumed that the defendant had been prejudiced by the delay.

In a recent decision by the supreme court of the United States, rendered March 1, 1943, in the case of *Clearfield Trust Company et al. v. United States*, 318 U. S. 363, 63 S. Ct. 573, 87 L. Ed. 838, it was held that, "The rights and duties of the United States on commercial paper which it issues are governed by federal rather than local law." The court further ruled that the duty rested upon a defendant claiming that action against him was barred because of laches, to show that the delay had "caused a manifest loss" to him, and that injury would not be presumed because of "the mere fact of delay".

■ In the instant case all the checks involved were signed by Zehrung as treasurer, and eight of them were countersigned by Keller as president, six by Tarrant also as president, and the remaining three by Echelberry as vice-president of the credit union. The three officers who countersigned were called as witnesses, and each testified that the checks signed by him were so signed after he had examined the application and note accompanying the check and found that the loan had been approved by the credit committee. Each also testified that it was his intention in signing the checks that the same be paid to the respective payees therein named. The officers who countersigned the checks relied entirely upon the fact that the applications for the loans had been approved by the credit committee.

There was testimony introduced at the trial to the effect that the credit committee considered every individual application for a loan before approving it.

The credit committee "would consider the party, the risk, how they had been paying up loans they had had before, and if it was a new member, . . . would investigate them." If the member requesting the loan was believed to be a poor risk, his application was denied. The credit committee did not at any time do anything to ascertain whether the signature on the application was actually that of the member whose signature it purported to be.

The by-laws of the credit union provided that all drafts, checks and notes of the corporation should be countersigned by the president or, in his absence, by the vice-president. They further provided that every application for a loan should be in writing and state the purpose for which the loan was desired, and the security offered, if any; and that no loan should be made unless the application received the unanimous approval of the members of the credit committee present.

The signatures of both the treasurer and the president or vice-president of the credit union were required to validate checks. In order to hold that the checks involved in this litigation were payable to bearer, according to the authorities relied upon by the defendant, it would be necessary to find not only that the officer countersigning the checks was a mere automaton, but also that the members of the credit committee in approving applications for loans were likewise automatons. The difference between the facts in this case and those in the cases upon which the defendant relies is clearly pointed out in the last above quoted excerpt from the opinion in *Security-First National Bank v. Bank of America*, in the distinction made between *Los Angeles Investment Co. v. Home Savings Bank*, supra, and some of the cases on which this defendant depends.

In all the cases relied upon by the defendant herein the cosigner of the check did not know that the payee named therein was even in existence, but in signing the check acted entirely upon the information given him by the defaulting employee. In the case at bar, before a check could be issued for a loan the credit committee had to approve the loan. Loans could be made only to members of the credit union, and before approving any application for a loan the credit committee satisfied itself that the applicant was a member of the credit union and was entitled to a loan. In most instances the members of the credit committee, or some of them, were personally acquainted with the applicant.

It is our opinion that the checks involved herein were not payable to fictitious or nonexistent persons. They were not payable to bearer, and the defendant should not have honored them when they were presented to it with endorsements forged by Zehrung.

The second assignment of error based on the denial of the defendant's motion for a directed verdict is that the signing of the checks by Zehrung and the cosigning by the president or vice-president "constituted a forgery of the corporation's name", and inasmuch as no claim was made to the defendant as to such forgery until more than thirty days after the return of the canceled checks to the plaintiff, the latter "is barred from maintaining this action under section 40-1009, O. C. L. A."

■ Section 40-1009, O. C. L. A., reads in part as follows:

"No bank . . . which has paid and charged to the account of a depositor a forged or raised check issued in the name of such depositor, shall be liable to such depositor for the amount paid thereon, unless within thirty days after the return

> to said depositor of the voucher representing such payment, said depositor shall notify the bank . . . that the check so paid is forged or raised."

This quoted provision has no bearing on forged endorsements. It applies only to checks on which the maker's name is forged: Brannan's Negotiable Instruments Law, 5th Ed., § 198, page 1097; 7 Am. Jur., Banks, § 512, page 366; *Atwell v. Mercantile Trust Co.*, 95 Cal. App. 338, 272 P. 799; *Union Tool Co. v. Farmers' & Merchants' National Bank*, 192 Cal. 40, 218 P. 424, 28 A. L. R. 1417; *Detroit Piston Ring Co. v. Wayne County & Home Savings Bank*, 252 Mich. 163, 233 N. W. 185, 75 A. L. R. 1273.

■ The checks on which this action is based were signed by the duly authorized officers of the plaintiff corporation. Even if it could be assumed that they were payable to fictitious persons, the corporation's name on them as maker was not forged. The cases cited by the defendant under its first assignment of error hold that checks of corporations requiring multiple signatures, signed by the authorized agents of the corporation and made payable to fictitious persons, were not forged instruments. See also, in this connection: *Fitzgibbons Boiler Co. v. Employers' Liability Assurance Corporation*, 105 F. (2d) 893, and authorities therein cited; and *Goucher v. State*, 113 Neb. 352, 204 N. W. 967, 41 A. L. R. 227 (especially the annotation in this last report). Moreover, the plaintiff in the case at bar is not attempting to recover from the defendant on the ground that its name on the checks was forged.

Under the third assignment of error relating to the court's denial of the defendant's motion for a directed verdict it is asserted that there was no evidence offered as to the amount of money actually

received by Zehrung on the checks here involved. There was evidence, however, that the amounts of these checks were paid by the tellers of the bank to Zehrung and charged against the plaintiff's account. This was testified to not only by the officers of the plaintiff corporation, but also by the tellers who cashed the checks in the defendant's bank. And in addition, allegations in the defendant's answer admit such payment.

■ The defendant's third affirmative answer alleges that part of the money paid to Zehrung was redeposited to the plaintiff's account. Zehrung testified that in some instances when he cashed checks on which he had forged the endorsement of the payee's name he used some of the money so received by him to make up discrepancies between the amounts of cash he had brought to the bank for deposit and the amounts shown on the accompanying deposit slips. He further testified that he did not know whether he had used for that purpose any money paid to him on the checks here in controversy. He was positive, however, that in all instances of redepositing any of the proceeds of such checks he had at the same time and with the same teller made other deposits to the plaintiff's account. All the deposit slips connected with entries to the plaintiff's account were in the possession of the defendant bank. Only eight of them were produced by the defendant at the trial. Three of those were introduced by the defendant to prove that the proceeds of the three checks withdrawn by the court from the jury's consideration had been deposited to the plaintiff's account.

Only one deposit slip produced by the defendant showed any cash deposited to the plaintiff's account by Zehrung on a date when he cashed any of the

checks. That slip showed items of seventy-six dollars in currency and sixty cents in silver, with a notation at the bottom of the slip showing the subtraction of $76.60 from $300. One of the witnesses testified that the notation was placed there by a teller. It could be inferred therefrom that Zehrung caused the sum of $76.60 to be taken out of the proceeds of a check for $300 which he cashed at that time. On the date shown on that slip Zehrung did cash one of the checks here involved in the sum of $300. He testified that he could not say whether the $76.60 then entered to the plaintiff's account was deducted from that particular check or from some other check that he might have cashed on the same day. It is reasonable to assume one of two facts, either that no cash was deposited to the plaintiff's account by Zehrung on any of the other days on which he cashed the fraudulent checks, or that if he did deposit cash in the plaintiff's name on those dates the deposit slips did not indicate the source of such cash.

The defendant does not request that the $76.60 above mentioned be deducted from the amount of the judgment awarded against it, but asserts that the trial court should have directed a verdict in its favor because of Zehrung's testimony in regard to the deposit of cash by him to the account of the plaintiff. We believe that this matter was properly left to the consideration of the jury. The plaintiff made out a *prima facie* case when it proved that the amount of the checks had been paid to Zehrung and charged against its account.

Another assignment concerns the alleged error of the court in overruling the defendant's objections to the evidence offered by the plaintiff "as to the custom or practice of the bank requiring that a person

presenting a check for payment endorsed in blank, should endorse the same.'' In support of this assignment the defendant contends that evidence of custom is admissible only for the purpose of interpreting a contract and not to prove the agreement itself. There was no written or express agreement between the plaintiff and the defendant, with the possible exception of the writing contained in the heading of the deposit slips, which had reference only to the terms and conditions on which deposits were accepted. It did not apply in any way to the conditions under which the bank would honor orders drawn on the plaintiff's account. There was, however, an implied contract between the parties.

In *Sawtelle v. Drew*, 122 Mass. 228, it is said:

> "A custom, within the meaning of the law, if general, is incorporated into and becomes a part of every contract to which it is applicable; if local, of every contract made by parties having knowledge of or bound to know of its existence.''

The foregoing excerpt was quoted with approval in *Harrison v. Birrell*, 58 Or. 410, 115 P. 141, as affecting an implied contract, and in *Hurst v. W. J. Lake & Co., Inc.*, 146 Or. 500, 31 P. (2d) 168, as applying to a written contract.

The following is stated in 25 C. J. S., Customs and Usages, subdivision *b*, § 19, page 95:

> "In the absence of specific instructions or an express agreement to the contrary, customs and usages of the banking business may have a binding force as between banks, and between a bank and the persons with whom it deals.''

In the amended complaint the plaintiff pleaded the legal effect of the contract between itself and the de-

fendant bank, which was in part denied by the defendant. The evidence established the relationship of depositor and banker between the parties, and it was proper for the plaintiff to offer proof of customs and usages in the banking business in regard to the duties owed the plaintiff by the defendant bank.

■ The remaining assignment of error is based on the defendant's exception to the following instruction:

"The person making the check payable in this case is the drawer of the check, Portland Postal Employees Credit Union, and not Edgar Zehrung, and in order to make these checks bearer checks, payable to the person in possession, you must find that the plaintiff, through its officers, issued checks to persons not intended to receive them."

Before giving the quoted instruction the court thus charged the jury:

"If, however, a check is payable to bearer, the person who has possession is authorized under the law to cash it, and if a loss results therefrom, the person making the situation possible, that is, the drawer or the issuer of the check, must suffer the loss, and not the bank that paid out the money. So, if you find from a preponderance of the evidence that the check was issued to a fictitious payee or to a person not intended to receive it, by the person making it so payable, then and in that event the check is payable to bearer, and the loss, if any, falls on the drawer of the check, and not on the bank."

The instruction to which the defendant excepted did not refer in any way to the knowledge or intention of Zehrung, but merely told the jury that the plaintiff credit union was the drawer of the checks and that in order to find that the checks were payable to bearer it was necessary to find that the plaintiff, through its

officers, issued them to "persons not intended to receive them." Had the defendant desired that the instruction be more comprehensive, it should have submitted to the court proposed instructions covering the exact points as to which it wanted the jury to be charged. This it did not do. No error was committed by the court in giving the instruction to which exception was taken.

The judgment appealed from is affirmed.

---

Petition for rehearing denied April 20, 1943

On Petition for Rehearing
(136 P. (2d) 259)

BAILEY, C. J. In a petition for rehearing, the appellant bank asserts that the record is entirely devoid of evidence that the credit committee of the respondent credit union approved the purported applications for loans involved in this case.

The form of such applications was mimeographed, and at the bottom thereof was the following:

"Credit Committee Report
"Date: ....................
"On this date, the application of ....................
has been approved — not approved. Reason: ..........

....................................................................................

....................................................................................
"Member Member Member
"Credit Committee".

Each application when presented to the credit committee contained the name of the applicant, the amount

of the loan requested, and other required information. As to every application involved in this case the report of the credit committee was signed by the required number of members thereof, but in no instance did the committee insert in its report the name of the applicant, nor did it state definitely therein whether the application had or had not been approved. That is to say, the words "not approved" were not crossed out, nor was any check mark placed beside the words "has been approved".

■ There is evidence in the record that when a loan was rejected by the credit committee a notation was made in its report, showing that fact; that in some instances the reason for the rejection was also noted; and that the signatures of credit committee members on a report, without anything else, showed that the application had been approved. There is also evidence that the note of the applicant for the amount of the loan requested was not procured until after the approval of the loan, and that such note, together with the application containing the report signed by members of the credit committee, was presented to the president or vice-president of the credit union at the time that the check for the amount of the loan was placed before him for his signature. The officers who cosigned the checks with Zehrung testified that they did not affix their signatures to the checks unless approved applications for the respective loans were before them, which indicates that those officers regarded reports signed by the credit committee in the manner above described as equivalent to approval of the loans. This method of showing approval was fully understood by the officers of the credit union and was a matter of concern only to that corporation.

From the evidence in the case, which is substantial, the jury could have found that the loans in question were approved by the credit committee before the checks were cosigned by officers of the credit union. In fact, we do not see how the jury could well have found otherwise. In our former opinion, in considering the defendant's motion for a directed verdict, we viewed the evidence in the light most favorable to the plaintiff, and on that account did not discuss in detail the credit committee's reports.

The petition for rehearing is denied.