Argued January 8; Reversed February 17, 1948

# HUTCHISON *v.* AETNA LIFE INSURANCE CO.

189 P. (2d) 586

*Frank E. Nash* and *Borden Wood,* of Portland, argued the cause for appellant. With Mr. Nash on the brief were King & Wood, of Portland.

*Ben Anderson* argued the cause for respondent. On the brief were Lord, Anderson & Franklin, of Portland.

Before Rossman, Chief Justice, and Belt, Kelly, Bailey and Hay, Justices.

BAILEY, J.

This action was instituted by plaintiff, Ada E. Hutchison, to recover for the alleged accidental death of her late husband, Orvil A. Hutchison, to whom the defendant, Aetna Life Insurance Company, a corporation, had issued on September 13, 1942, a group accidental death and dismemberment policy, in which plaintiff had been designated the beneficiary. Under the terms of this policy the insurance company agreed to pay to the beneficiary therein named the sum of $2,000, in the event that the death of the insured "resulted directly, and independently of all other causes, from bodily injuries * * * sustained solely through external, violent, and accidental means", and was not "caused directly or indirectly, wholly or partly, by bodily or mental infirmity". The case was tried to a jury which returned a verdict in favor of plaintiff for the sum of $2,000, the face of the policy, and the further sum of $500 as attorneys' fees. From the judgment entered thereon defendant has appealed.

Two of defendant's assignments of error are based upon the refusal of the court to grant (1) its motion for a judgment of involuntary nonsuit, and (2) its

motion for a directed verdict in its favor. Failure of the plaintiff to prove that the death of her husband resulted from an accidental injury of the kind covered by the policy was assigned by defendant as the reason why these motions should be granted. Since the motion for a directed verdict presents for decision the same question that is raised by the motion for judgment of non-suit, *Portland Postal Employees Credit Union v. United States National Bank,* 171 Or. 40, 48, 135 P. (2d) 467, 136 P. (2d) 259, we shall consider only the alleged error of the court in denying defendant's motion for a directed verdict.

The evidence is substantially as follows: Orvil Hutchison was 34 years old at the time of his death, which occurred on January 10, 1945. At the age of 12 years he had an operation for a ruptured appendix, which is referred to later in connection with insured's death. He was described as an active, athletic type of man; he participated in athletics in school, and was a trained boxer. He began working for the Oregon Shipbuilding Coroporation about August 9, 1942, and continued to work for that company until the 5th of January, 1945, except as hereinafter mentioned. On November 28, 1944, while Hutchison was working in the shipyard as lead man of a rigging crew, he and a member of his crew were attempting to unload heavy steel plates from a railroad gondola car when he slipped and fell, striking his right side on the corner of some of the steel plates. The fall was sufficient "to knock the wind out of him". After a few minutes he recovered his breath and continued to work for the remainder of the day. He did not report the mishap to the first aid station or notify anyone in charge of the shipyard. That evening, when Hutchison arrived home,

he told his wife that he "didn't feel very good" and that he had pains in his side. Between 11 and 12 o'clock that night he was taken to the Jones Hospital in Hillsboro and Dr. David E. Wiley of Hillsboro was summoned. Dr. Wiley did not see Hutchison until the following day, at which time Hutchison complained to him of pain and soreness in the right groin. He told Dr. Wiley that he had, just before leaving work the night before, jumped from a scaffold to a ship deck, and that a "rupture on the right side had come out suddenly", which he had replaced. Dr. Wiley testified that he found no external bruise and nothing in the hernial sac, but that there was pain and a little swelling in the right inguinal region. He diagnosed the case as a "possible contusion of bowel".

After Hutchison had been treated in the hospital for a few days, he had recovered sufficiently to enable him to go home, where he remained about a week before returning to the shipyard on December 11th. Subsequently to his return from the hospital his side was "touchy, and he would lay down a lot"; his clothes fitted tighter around his stomach; he had to keep loosening his belt; he had no appetite and he "just ate mostly liquids". After he returned to work he kept complaining about his side, and "he never played with the children any more in the evenings like he had before." One of Hutchison's crew mates testified that he appeared to be suffering from his accident and that he was favored in his work by his crew.

On January 5, 1945, thirty-eight days after the alleged accident on the morning of November 28th, Hutchison and a crew member "went to get a load of what you call flat bar" piled in stacks. They were using cross bars to separate the bars, so that slings

could be put around them, when suddenly Hutchison became ill. He had no accident on that day. He was taken to the first aid station in the shipyard and from there his wife took him to the Jones Hospital in Hillsboro. Dr. Wiley was again summoned. He stated that Hutchison "was complaining of similar symptoms, pain in the groin again, the right groin"; that Hutchison stated to him "that since I had seen him last in November, or when he had left the hospital last time, that the rupture had come down a time or two again, he had replaced it, himself, but that—this was a Friday, and that day he had had a good deal—developed pain in this side, and discomfort." Dr. Wiley thought, when he examined Hutchison on January 5th, that he "was probably suffering similar symptoms, similar condition such as he had the time before", and hoped that he would respond to the same treatment. For a few days there "wasn't much change" in Hutchison's condition, and "perhaps the pain got a little worse, if anything." Dr. Wiley stated that on January 9th "symptoms of complete obstruction of the bowel developed with great rapidity, and I again called Dr. Pittman in consultation, and we decided to operate, and we operated, and on opening the abdomen, we found the peritoneum, or a big apron that covers the bowel, down in the hernial sac, a small amount of it, and that was adherent there, and we simply severed that at the opening of the sac and pushed it to one side, and then we, in exploring behind, we found several bands of adhesions constricting the bowel, and we severed those adhesions, and we found the small bowel much more distended than we expected to." He stated that in his opinion these adhesions were of long standing and "were due to an old operation for ruptured appendix that he had had before," and that the imme-

diate cause of the insured's death was the intestinal obstruction caused by the adhesions.

The death certificate signed by Dr. Wiley gave as the immediate cause of death, "Acute intestinal obstruction Due to Adhesions & trauma from frequent recurrence & reduction of rt inguinal hernia". On cross-examination by defendant, Dr. Wiley, in referring to this certificate, stated: "I believe I was in error in ascribing these adhesions to the hernia rather than to the old appendix operation." The hernia had existed for some time prior to the accident of November 28, 1944.

Dr. Alan Welch Smith was called by plaintiff as a medical expert. His qualifications were admitted by the defendant. At the conclusion of a hypothetical question propounded to him, Dr. Smith was asked: "Assuming those to be facts, Doctor, would you say that the accident was the probable cause of his death?" to which he answered, "Well, from a medical and surgical standpoint, it strikes me that this whole thing which was the active cause of this was an accident which the man had."

Dr. Archie O. Pittman, who resides at Hillsboro, was consulted by Dr. Wiley when Mr. Hutchison was first confined to the hospital. He was again called upon by Dr. Wiley to assist him in performing the operation on Mr. Hutchison on January 9th. He testified that in his opinion the immediate cause of Mr. Hutchison's death was the "strangulation of the bowel" caused by "adhesive bands in the lower right quadrant of the abdomen." Asked what caused the adhesions, he said: "Judging from the history of the previous attack of acute appendicitis, which had ruptured and been subsequently operated, it is prob-

able that the previous appendicitis and the existing localized peritonitis at the time were the cause of the adhesions.''

The defendant also called, as an expert medical witness, Dr. Warren C. Hunter, of Portland. In answer to a long hypothetical question, which assumed the facts as presented by the evidence, Dr. Hunter stated:

"A. My answer to the question would be that, assuming these facts to be correct, that the immediate cause of death was strangulation of the small bowel beneath adhesions in the iliocaecal region.

"Q. Now, Doctor, with reference to the same facts, what factors would you consider important as causing or contributing to cause the death of this man? A. I would consider that the fact that the man had appendicitis, even though it was years before, even though the appendix was removed, the fact that the appendix was found to be ruptured would lay an adequate foundation for the formation of adhesions directly attributable to the appendicitis and the rupture of the appendix. He could have had those adhesions for many years without any harm until such time as a loop or loops of bowel should slip under them, and never know that he had anything wrong with him. The stage was set at any time, but it simply didn't happen until one occasion a few days before his death.

"Q. In the case of an obstructed intestine, how long can a man continue his normal activity? That is the question, Doctor. Assuming that a man has an obstructed intestine, how long can he continue with his normal activity? A. Well, the ordinary individual who is at all sensitive to pain does not continue his activities very long without making his complaints known—that is, to put the answer in other words, obstruction of the small bowel is something that lets its presence be known rather quickly, a matter of minutes or a few hours at the very most before symptoms can be noticed.

"Q. And if that obstruction isn't relieved, Doctor, how long can a man live with an obstructed intestine? A. A matter of days. It depends—there is no one answer that will fit. I would say a matter of days. Certainly under a week. I never saw anyone go longer than that."

Dr. Hunter gave this further testimony:

"Q. In your experience have you ever found that adhesions were ever caused by an external blow about a man's abdomen? A. I have never seen any that I knew from the history of the individual were caused in that manner. They have always been caused by other things.

"Q. Is an appendectomy after a ruptured appendix a common cause of adhesions? A. It is one of the commonest causes of adhesions, because when rupture takes place, the infection is spilled beyond the limits of the appendix, and a generalized inflammation of the whole abdomen may result, or it may be only localized; but certainly it is one of the commonest of all causes for adhesion formation."

■ To entitle plaintiff to recover on the policy, she must prove that her husband's death resulted from bodily injuries effected solely through external, violent, and accidental means. It must have resulted directly from such injuries and independently of all other causes, and must not have been "caused directly or indirectly, wholly or partly, by bodily or mental infirmity". *Seater v. Penn Mutual Life Ins. Co.*, 176 Or. 542, 156 P. (2d) 386, 159 P. (2d) 826; *Michener v. Fidelity & Casualty Co.*, 200 Iowa 476, 203 N. W. 14; *Bouchard v. Prudential Ins. Co.*, 135 Me. 238, 194 A. 405; *Penn v. Standard Life & Accident Ins. Co.*, 160 N. C. 399, 76 S. E. 262, 42 L. R. A., N. S., 597; *Lucas v.*

*Metropolitan Life Ins. Co.,* 339 Pa. 277, 14 A. (2d) 85, 131 A. L. R. 235, and annotation at 240.

■ The words "disease" and "bodily infirmity", frequently used in exceptions in accident insurance policies, are construed to be practically synonymous, "and to refer only to some ailment or disorder of an established or settled character to which the insured is subject." 29 Am. Jur. 747, § 995.

■ In *Penn v. Standard Life Insurance Co.,* supra, the court, from the adjudications construing policy contracts which contain provisions similar to those in the policy now under consideration, deduces three rules, to wit:

"(1) When an accident caused a diseased condition, which together with the accident resulted in the injury or death complained of, the accident alone is to be considered the cause of the injury or death.

"(2) When at the time of the accident the insured was suffering from some disease, but the disease had no causal connection with the injury or death resulting from the accident, the accident is to be considered as the sole cause.

"(3) When at the time of the accident there was an existing disease, which, co-operating with the accident, resulted in the injury or death, the accident cannot be considered as the sole cause or as the cause independent of all other causes."

These rules, so clearly stated by the supreme court of North Carolina, have been generally accepted and approved by other courts. *Bouchard v. Prudential Ins. Co.,* supra, and cases therein cited; Annotation, 131 A. L. R. 240.

We shall now consider whether there is substantial evidence to support a verdict in favor of plaintiff, and, in doing so, we shall eliminate from con-

sideration Dr. Smith's answer, hereinbefore set forth, to the hypothetical question propounded to him by plaintiff. Defendant's objection to that question, on various grounds, was overruled, and the ruling of the court thereon forms the basis of one of its assignments of error. In answering defendant's argument that its objection should have been sustained, plaintiff, in her brief, stated: "The answer of the doctor was of questionable assistance to the jury in that it was indefinite". In his oral argument before this court, her counsel, in discussing the objection to the hypothetical question, observed:

"We take this further position that we might take the testimony of Dr. Smith entirely out of this case and have a good prima facie case that was entitled to go to the jury. As a matter of fact, Dr. Smith's answer was quite worthless. \* \* \* It does not mean anything, that is, I mean his answer.
\* \* \*

"Chief Justice: (Interrupting) So that we won't misunderstand, you want us to understand that Dr. Smith's testimony was entirely worthless?

"Mr. Anderson: Yes, in substance."

■ Without further discussing the character of Dr. Smith's answer, we agree with plaintiff's counsel that the answer was "indefinite", "quite worthless", and that it "does not mean anything". His testimony, in this respect, was wholly devoid of probative value or force.

■ Counsel for plaintiff announced, at the time he called Dr. Wiley to the witness stand, that he was being called as an adverse witness, and in plaintiff's brief is the statement that Dr. Wiley was called by her "as an adverse witness, having testified in a related case against the Accident Commission." Dr. Wiley is not

the defendant in this action, nor the assignor, agent, officer, or employee of the defendant corporation, and, therefore, when plaintiff called him as a witness, she vouched for his credibility. § 4-709, O. C. L. A.; *McKinnon v. Chenoweth,* 176 Or. 74, 99, 155 P. (2d) 944, and authorities therein cited. Labeling Dr. Wiley an adverse witness did not make him such, nor did it give to the plaintiff the right and protection accorded, by § 4-709, *supra,* to a litigant who calls as a witness an adverse party or an employee of such party.

One of Mr. Hutchison's crewmen testified that Hutchison slipped and fell "early in the morning" of November 28, 1944, while at work in the shipyard, striking his right side on the corner of some steel plates. After Hutchison recovered his breath he continued to work for the remainder of the day and "didn't complain anymore". Dr. Wiley testified that when he called on Hutchison at the hospital in Hillsboro the following day, Hutchison told him that just before leaving work on November 28th he had jumped from a scaffold to a ship deck, causing the injury. The Jones Hospital record, dated November 28th, in referring to how Hutchison's injury happened, has this notation: "Jumped down into gondola, strained stomach muscles, causing hernia to come out."

■ We shall not undertake to suggest the cause of this injury. It should, however, be noted that there is no evidence that any injury which the deceased may have sustained from jumping was caused through accidental means. If the jumping was intentional and no mischance, slip, or mishap occurred during the act, the injury resulting therefrom, if any, would not have been caused through accidental means. *Seater v. Penn Mutual Life Ins. Co.,* supra; *Bertschinger v. New York Life Ins. Co.,* 166 Or. 307, 111 P. (2d) 1016; *Kendall v.*

*Travelers' Protective Ass'n,* 87 Or. 179, 169 P. 751. There is no evidence, and no claim is made, that Hutchison had an accident after November 28th.

■ The fact that Hutchison's death followed an injury is not proof that death resulted therefrom. ''The connection between the two must be proven with reasonable certainty''. *Spicer v. Benefit Ass'n of Ry. Employees,* 142 Or. 574, 17 P. (2d) 1107; 21 P. (2d) 187, 90 A. L. R. 517.

■ In view of the factual situation disclosed by the record, expert opinion testimony was essential to enable the jury to decide whether the insured's death ''resulted directly, and independently of all other causes, from bodily injuries * * * sustained solely through external, violent, and accidental means''; and that it was not ''caused directly or indirectly, wholly or partly, by bodily or mental infirmity''. We have eliminated from consideration the testimony of Dr. Smith. The other three medical experts testified that in their opinion the cause of Mr. Hutchison's death was the strangulation of the bowel caused by adhesions, and that these adhesions were of long standing and attributable to an old operation for a ruptured appendix. They were of the opinion that the insured's death was not caused by any mishap occurring on November 28th.

■ There was no substantial evidence to prove that the death of plaintiff's husband resulted from an accidental injury covered by the policy, and hence there was no substantial evidence to support a verdict in her favor. Therefore, defendant's motion for a directed verdict should have been granted.

The judgment appealed from is reversed and the cause remanded to the circuit court with instructions to enter judgment in favor of defendant.