Argued March 9, affirmed April 12, petition for
rehearing denied May 9, 1961

# FRIES *v.* JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY

360 P. 2d 774

*Burt Bennett,* Portland, argued the cause for appellant. With him on the briefs were Anderson, Franklin, Jones & Olsen, Portland.

*Herbert H. Anderson,* Portland, argued the cause for respondent. With him on the brief were Koerner,

Young, McColloch & Dezendorf, and Stanley R. Loeb, Portland.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, GOODWIN and LUSK, Justices.

PERRY, J.

The plaintiff brought this action to recover under the accidental death benefit coverage of a policy of insurance issued to her husband by the defendant. The jury returned a verdict for the plaintiff. On motion of the defendant for judgment non obstante veredicto, the trial court set aside the judgment rendered on the verdict of the jury and caused judgment to be entered for the defendant. From this order of the trial court the plaintiff appeals.

The evidence discloses that plaintiff's husband at the time of his death was a man 71 years of age; his vocation was that of a food broker and he was actively engaged in his work until his death. On December 9, 1958, Mr. Fries (hereinafter designated as "the deceased") was operating his automobile on southwest Taylor street and a Mr. Green was operating his automobile on 9th street, both streets being in the city of Portland. At the intersection of these two streets the two automobiles came in contact, the deceased's automobile striking in a swiping motion across the right front portion of the Green automobile. After striking the Green automobile, the deceased continued across the intersection where he stopped. The injury to the deceased's automobile is described by one witness as a "scrape, nothing serious." After the deceased stopped his automobile, he got out, picked up some chrome from the pavement, put it in his automobile, and then walked over

to where Mr. Green and a Mr. Williams, who was a passenger in the Green automobile, were standing. He stopped before these parties and "simply stood there." Mr. Williams said, "You fellows better get your drivers' licenses and so forth out here, and Mr. Fries started to reach for his pocket and dropped." The deceased's fall is described by Mr. Williams as follows:

"Q   How did he go down now? Describe it.
"A   He went down, just slumped.

"Q   He slumped over?
"A   His head dropped back.

"Q   He slumped over and his head slumped back? Did he grab for his heart?
"A   I wouldn't remember that.

"Q   Did he let out any cry?
"A   Not at all.

"Q   He just slumped down. Did you observe his eyes as he went down?
"A   No, not as he went down.

"Q   Did his eyes roll up?
"A   After he got down, I noticed his eyes, they were open.

"Q   And what did he hit his head on, the pavement?
"A   He hit the back of his head right on the pavement.

"Q   Did he hit it pretty hard?
"A   Yes."

Mr. Green described what occurred at this time as follows:

"A   Well, Mr. Fries got out of his car, came around, picked up a piece of molding, and by that time I was over at the corner on the curb. He put the molding in his car and walked over to me, and I said, 'Fellow, that sign means stop.'

"Q Did he say anything then?

"A He did not say a thing. He was just awful nervous. He was shaking. So Mr. Williams piped up and said, 'Well, you better get your licenses out,' and apparently Mr. Fries made an effort to reach in his hip pocket and he—as he reached down, fell flat on his back. At that time his feet were dancing around, which he was quite nervous, and as he hit the ground, I stooped down and picked his head up and pulled his coat up and held his head out of the dirt, out of the water.

"Q Did you notice his hands shaking?

"A Not after he hit the ground, no. I don't think he did a lot of moving at all.

"Q I mean before he hit?

"A His hands were shaking and his feet were just kind of dancing around. He seemed quite nervous.

"Q He seemed nervous?

"A Yes.

"Q Did you notice, was he pale or—

"A (Interposing) No, I don't remember.

"Q You don't remember that. All right. Did he do anything, did he clutch at his heart or let out any groan?

"A Never made a sound.

"Q He just slumped over? Then did you notice any blood on him?

"A Not until the officer arrived, and I had kept his head up out of the water, so the officer said, 'Put his hat under it,' and as I turned his head loose, I had blood in my right hand.

"Q As you were holding his head there, were you able to feel any sensations in his body?

"A Yes, I could feel his heart.

"Q Tell the jury what you felt?

"A Well, I had my hands right up next to his neck and his heart beat a little bit and slow up

and beat a little more, and about three minutes, or three to five minutes he was dead.

"Q   So his heart was beating after he fell?

"A   Yes, sir."

The parties stipulated that:

"Mr. Fries was examined by a doctor in December, 1952 with complaints of fatigueability, nervousness, foot swelling, cough, and obesity, and that these subjective complaints had been present for about six months and that there was a medical diagnosis at that time of arteriosclerotic heart disease, FC II, with congestive failure."

There is no evidence that the deceased suffered any visible external bodily injuries by reason of the contact of the automobiles. Dr. Edwin A. Mickel, called to give an expert's opinion of the cause of deceased's death, testified that, although there was evidence deceased was afflicted with a serious heart condition, it was his opinion "that this man died of the injury he suffered to his brain as a result of the fall that he took." He also stated it was his opinion that deceased fainted "as a result of the nervous condition he suffered."

Dr. Warren C. Hunter, under whose instruction an autopsy was performed, was of the opinion that death was due to the diseased condition of deceased's heart.

The insuring clause of the policy is as follows:

"If the employee, while insured for Accidental Death and Dismemberment Insurance under this Policy, suffers any of the losses described below, as a result of bodily injuries sustained solely through external, violent and accidental means, directly and independently of all other causes and within ninety days from the date of such injuries, the Company shall pay to the employee, if living,

otherwise to the beneficiary, the amount of insurance specified for such loss in the following Schedule of Indemnities, determined on the basis of the Full Amount of Insurance set forth in the provision entitled 'Amounts of Insurance' contained herein; provided, however, that no payment shall be made for any loss caused wholly or partly, directly or indirectly, by (a) disease, or bodily or mental infirmity, or medical or surgical treatment thereof; * * *"

There is no contention that the deceased's fall was immediately caused by slipping or tripping, but that the requirements of the insuring clause are met by plaintiff's contention that the evidence discloses deceased was involved in an automobile accident, that this incident made him nervous, and his nervousness caused him to faint, fall and strike his head on the pavement causing his death. In other words, the proximate cause of injury was the automobile accident.

An examination of the policy shows that the policy eliminates recovery for an injury "wholly or partly, directly or indirectly, by (a) disease, or bodily or mental infirmity," and requires for recovery thereunder that the proximate cause of the injury must be the result of an accident insured against.

In *Hutchison v. Aetna Life Insurance Co.*, 182 Or 639, 189 P2d 586, where, in construing a policy contract identical in its requirements with the policy contract now before us, we approved of the rules enunciated by the Supreme Court of North Carolina in *Penn v. Standard Life & Accident Ins. Co.*, 160 NC 399, 76 SE 262, 42 LRA NS 597, it is pointed out, 182 Or 648, as follows:

" '(1) When an accident caused a diseased condition, which together with the accident resulted in

the injury or death complained of, the accident alone is to be considered the cause of the injury or death.

" '(2) When at the time of the accident the insured was suffering from some disease, but the disease had no causal connection with the injury or death resulting from the accident, the accident is to be considered as the sole cause.

" '(3) When at the time of the accident there was an existing disease, which, co-operating with the accident, resulted in the injury or death, the accident cannot be considered as the sole cause or as the cause independent of all other causes.' "

This court, in *Hutchison v. Aetna Life Insurance Co.,* supra, 182 Or 639, 648, stated:

"The words 'disease' and 'bodily infirmity,' frequently used in exceptions in accident insurance policies, are construed to be practically synonymous, 'and to refer only to some ailment or disorder of an established or settled character to which the insured is subject.' 29 Am Jur 747, § 995."

Therefore, in seeking a solution to the problem before us, we are not interested in the result of the fall, i.e., whether deceased died of the skull fracture or heart failure. *Thompson v. General Insurance Company of America,* 226 Or 205, 359 P2d 1097; *LaBarg v. United Ins. Co.,* 209 Or 282, 303 P2d 498, 306 P2d 380. The sole question is—Did deceased fall because of violent, external and accidental causes?

Dr. Mickel, appearing on behalf of the plaintiff, was of the opinion the deceased fell because of nervousness, created by the collision, which caused him to faint and then fall. Dr. Hunter was of the opinion that a partial or total heart failure caused the fall.

If we assume from Dr. Mickel's statement, "This man fainted as a result of the nervous condition he

suffered," he means a fright created by the occurrences surrounding the collision of the automobiles and not the defendant's bodily condition, which it appears from the stipulation of the parties he suffered since 1952, we must find that a psychological event is a violent, external and accidental means causing bodily injury. If we cannot make this assumption, it is quite clear that disease caused the fall and no recovery may be had.

■ Since the defendant's policy of insurance uses the conjunctive "and" with reference to the cause of injury, "violent, external *and* accidental," each of these elements must be present to create liability thereunder. *Travellers' Ins. Co. v. McConkey,* 127 US 661, 32 L Ed 308, 8 S Ct 1360; *Schonberg v. New York Life Insurance Company,* 235 La 461, 104 So 2d 171; *John Hancock Life Insurance Co. v. Plummer,* 181 Md 140, 28 A2d 856; *Oklahoma Nat. Life Ins. Co. v. Norton,* 44 Okla 783, 145 P 1138.

"*The term 'violent,'* in such provisions, signifies merely that a physical force, however slight, is efficient in producing the injury" (Italics theirs) 45 CJS 784, Insurance § 754.

There is not the slightest bit of evidence in this case that any physical force of any nature was applied to the body of the deceased and proximately caused him to fall.

■ In our opinion a mere mental picture conjured in the mind of an individual which causes that individual to faint cannot be considered either violent or external within any reasonable interpretation of the policy contract. *Provident Life & Acc. Ins. Co. v. Campbell,* 18 Tenn Ap 452, 79 SW2d 292.

The judgment of the trial court is affirmed.